**UNITED STATES of America,
Plaintiff,**

v.

**Stephanie LANDA, Kevin F. Gage, and Thomas I. Kikuchi, Defendants.**

**No. CR 02–0220 WHA.**

United States District Court,
N.D. California.

July 31, 2003.

George L. Bevan Jr., U.S. Attorney's Office, San Francisco, CA, for United States.

Zenia K. Gilg, Law Offices, San Francisco, CA, for Stephanie Landa.

J. David Nick, San Francisco, CA, for, Kevin F. Gage.

William G. Panzer, Oakland, CA, for Thomas I. Kikuchi.

### SENTENCING MEMORANDUM

ALSUP, District Judge.

In this large-scale marijuana-cultivation case, this memorandum states the reasons for the sentencing decision. The defendants are Stephanie Landa, Kevin Gage, and Thomas Kikuchi, all residents of Southern California in their thirties or forties, as the case may be. Pursuant to plea agreements, they all pled guilty to maintaining a place for the manufacturing of marijuana in violation of 21 U.S.C. § 856(a)(1). Via their plea agreements, all defendants waived all grounds for a motion for downward departure except as discussed below.

The offense arose out of a large indoor cultivation facility in San Francisco. The

following brief summary is not in dispute. Defendants leased commercial space at 560 Brannan Street and used it to grow marijuana in four rooms on two levels, using 100–plus high-intensity electric grow lamps, an irrigation drip system, and chemicals and fertilizer. The enterprise obviously entailed considerable capital investment, time and energy. Defendants intended to recoup their investment, to repay lenders, and to help support themselves through sales of marijuana. On July 18, 2002, the San Francisco Police Department raided the facility, leading to the seizure of at least 1,245 rooted plants. The three defendants were then charged by the United States in the present action. They pled guilty to the offense in October 2002, pursuant to plea agreements under Rule 11(c)(1)(A) and (B).

For sentencing, the proceedings were unified for all three defendants and covered many hours over several months. Live evidence was received. Two rounds of supplemental submissions were invited and received. The Court required and obtained a supplemental probation report. Altogether, three hearings have been conducted.

\* \* \* \* \* \*

■ Before turning to the main issue, a brief discussion is necessary to recalculate the criminal-history category of two defendants. Defendant Kikuchi has moved to recalculate his criminal-history category. His plea agreement arguably bars such a recalculation, since the plea agreement stipulated to the offense level and promised not to ask for any downward departures not listed. Nonetheless, the motion has been GRANTED because the record shows that his 1998 conviction resulted only in home detention, not custodial time. Accordingly, Mr. Kikuchi's Criminal History Category is reduced to I. Additionally, for the same reason, the parties stipulated at a prior hearing that Mr. Kikuchi is

eligible for a two-level reduction under U.S. Sentencing Guidelines Manual ("U.S.S.G.") §§ 2D1.1(b)(6), 5C1.2. Accordingly, his offense level is reduced from 23, as indicated in his plea agreement, to 21.

■ Defendant Gage has also moved to lower his criminal history category on the ground that Category II overstates his actual criminal history. He moves primarily on the ground that the only prior felony *conviction* occurred more than ten years before the present case, although the *sentence* occurred within the ten-year period (albeit by only a few days). The government opposes the request. It mainly argues that the similarity of the earlier felony to the present felony reinforces seriousness of the record. This is a fair point but nonetheless, taking the totality of the criminal history into account, the Court finds that the defendant's criminal-history category significantly over-represents the seriousness of the defendant's criminal history. U.S.S.G. § 4A1.3, p.s. The motion to reduce Gage's criminal history to Category I will be GRANTED.

Consequently, by stipulation and subject only to specified and circumscribed grounds for a motion for downward departure, the agreed-on sentencing ranges for the three defendants are as follows:

| DEFENDANT | ADJUSTED OFFENSE LEVEL AND CRIMINAL HISTORY | RANGE |
| --- | --- | --- |
| Thomas Kikuchi | 21—I | 37—46 months |
| Kevin Gage | 23—I | 46—57 months |
| Stephanie Landa | 23—II | 51—63 months |

Stephanie Landa has reserved the right to move for a downward departure based on her family obligations and a physical injury. That motion will be considered after the consideration of the principal motion for downward departure affecting all three defendants.

\* \* \* \* \* \*

The omnibus issue concerns the downward-departure motion based on "medical marijuana" as it relates to the purpose of the cultivation at 560 Brannan Street and the difference between state and federal law. The defendants agreed to exclude from their motion "anything having to do with the meeting with SFPD (Captain Cashman and Inspector Halloran) or District Attorney Terence Hallinan if there was contact with him . . . ." Nonetheless, on its own motion, the Court has requested, received and considered information broader in scope than permitted by the plea agreements. U.S.S.G. § 6B1.4(d), p.s., cmt.

This criminal action has been presented by the defense as a "medical marijuana" case. In that connection, reference has been made to the recent and well-publicized case of *United States v. Edward Rosenthal,* CR 02–0053 CRB, in which Judge Charles Breyer of this district sentenced Edward Rosenthal to one day in custody, a duration already served before trial, plus a fine and a three-year term of supervised release. The *Rosenthal* case, however, is not parallel to the present case, for the following reasons. *First,* the defendant in that case had no prior criminal record. As a first-time offender, among other reasons, he was eligible for the so-called Safety Valve, according to Judge Breyer. In contrast, all of the defendants herein have criminal narcotics records. Ms. Landa, for example, has a federal conviction for heroin importation. All the defendants have previous marijuana convictions. *Second,* for sentencing purposes, Judge Breyer credited Mr. Rosenthal's claim that Mr. Rosenthal believed, albeit wrongly, that an ordinance passed by the Oakland City Council had expressly immunized him from federal and state prosecution. In contrast, all defendants herein knew that their marijuana cultivation violated federal law. They so stipulated in their plea agreements. They

further admit that there was no similar ordinance enacted by San Francisco purporting to immunize them from federal prosecution. These two factors make the present case stand apart from the *Rosenthal* case.

■ Regardless of the *Rosenthal* case, however, defendants are entitled to have their motions decided on the merits. Under 18 U.S.C. § 3553(b), a sentencing court may depart from the indicated sentencing range established by the applicable guideline if the court finds that there exists "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guideline that should result in a sentence different from that described." *See also* U.S.S.G. § 5K2.0, p.s. All defendants contend that their activities were lawful under California Proposition 215, the California Medical Marijuana Initiative of 1996, which added Section 11362.5 to the California Health and Safety Code. From this, they argue that a conflict between state versus federal law over medical marijuana should take this case out of the heartland of normal marijuana cases. Although not entirely dispositive of defendants' motion, the Court must reject the argument that defendants' large-scale grow was lawful under state law, for the following reasons. The key provisions of the Compassionate Use Act of 1996 were and are found in subsections d and e of Section 11362.5:

(d) Section 11357, relating to the possession of marijuana, and section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary care giver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician.

(e) For the purpose of this section, "primary care giver" means the individual *designated* by the person exempted under this section who has consistently assumed responsibility for the housing, health, or safety of that person.

Cal. Health & Safety Code § 11362.5 (emphasis added).

Significantly, under these provisions, possession and cultivation of marijuana have been immunized from state prosecution only as to patients and primary caregivers, and even then only when the patient uses marijuana upon the written or oral recommendation or approval of a physician. In no way did Proposition 215 immunize large-scale growing operations intended to distribute marijuana, as here.

Specifically on point is a decision of a California Court of Appeal, *Lungren v. Peron*, 59 Cal.App.4th 1383, 1389–90, 1400, 70 Cal.Rptr.2d 20 (1997), holding that a cannabis buyer's club intending to distribute medical marijuana is *not* immunized by Proposition 215. That decision held:

> Respondents, operating a commercial enterprise selling marijuana to any qualified public purchaser, do not qualify as "'primary caregiver[s]'" of each such purchaser under section 11362.5(e) by simply obtaining from the purchaser a designation as such prior to and as a condition of a marijuana sale to that person. One maintaining a source of marijuana supply, from which all members of the public qualified as permitted medicinal users may or may not discretionarily elect to make purchases, does not thereby become the party "who has *consistently* assumed responsibility for the housing, health, or safety" of that purchaser as section 11362.5(e) requires. (Italics added.) Respondents are, consequently, not immunized against the enforcement of section 11570 against them because they allegedly store, possess, and sell marijuana in the capacity of consistent primary caretakers of the health and safety of their numerous purchasers.

> \* \* \* \* \* \*

> The initiative and section 11362.5 provide a defense for patients and primary caregivers only, to prosecution for only two criminal offenses: section 11357 (possession) and section 11358 (cultivation). Moreover, this defense is limited to the narrow circumstances approved by the voters in enacting section 11362.5, and does not allow the importation or cultivation of marijuana by large commercial enterprises, such as the Cannabis Buyer's Club.

*Lungren*, 59 Cal.App.4th at 1390–1400 (emphasis in original); *see also People v. Galambos*, 104 Cal.App.4th 1147, 1161, 128 Cal.Rptr.2d 844 (2002).

Despite popular misconception, Proposition 215 did not legalize large-scale marijuana processing and distribution—even for eventual medical marijuana uses. Rather, its state immunity from state prosecution has been limited to possession and use by qualified patients and their qualified primary care-givers. (A separate provision exonerates physicians who recommend marijuana, but that provision could have no applicability here.)

\* \* \* \* \* \*

■ Defendants further argue that they should receive a downward departure because they desired to avoid a lesser harm, namely the pain and suffering that they and others will endure if they are denied medical marijuana. U.S.S.G. § 5K2.11, p.s. provides:

> Lesser Harms (Policy Statement)

> Sometimes, a defendant may commit a crime in order to avoid a perceived greater harm. In such instances, a reduced sentence may be appropriate, provided that the circumstances signifi-

cantly diminish society's interest in punishing the conduct, for example, in the case of mercy killing. Where the interest in punishment or deterrence is not reduced, a reduction in sentence is not warranted. For example, providing defense secrets to a hostile power should receive no lesser punishment simply because the defendant believed that the government's policies were misdirected. In other instances, conduct may not cause or threaten the harm or evil sought to be prevented by the law proscribing the offense at issue. For example, where a war veteran possessed a machine gun or grenade as a trophy, or a school teacher possessed controlled substances for display in a drug education program, a reduced sentence might be warranted.

The factual predicate for the motion is the assertion that all of defendants' large-scale cultivation was intended ultimately to be distributed to ill patients whose doctors had recommended marijuana and that none of it would have gone to casual or recreational users. The obvious problem with the assertion is the ease with which any large-scale cultivator, no matter how guilty, could invoke, after detection and apprehension, the same claimed future benevolent intentions. To address this problem, defendants were given an opportunity to submit declarations and proof to demonstrate that their full inventory would ultimately have gone to sick patients with physicians' recommendations for marijuana. The sentencing hearing was continued approximately a month to allow for these submissions and their review.

Despite ample opportunity to substantiate the factual basis for the motion, the following gaps in the record are problematic: (i) there were no inventory controls in place to prevent misuse of the marijuana inventory and to assure that all inventory wound up with qualified patients; and

(ii) there were no written agreements (or even firm oral agreements) in place to assure that the inventory was fully committed to patients or caregivers (or even to cannabis clubs). The most that the record establishes is that, after attending meetings in which the local police gave advice on medical marijuana and stated that they would not cooperate with federal authorities, defendants had discussions with various organizations and individuals about supplying marijuana for medicinal uses. These discussions were inconclusive and left many options open. Although defendants now say that all of their output would have gone for medicinal uses, it is troubling that no documents, records or controls were prepared at the time of the grow operation to substantiate their claimed intent. This is further troubling given that the local police themselves indicated to defendants that federal authorities took a different view of the matter. As stated, defendants have stipulated that they all knew their activity was in violation of federal law.

That said, the Court nonetheless finds that at least a substantial part of the marijuana in question was ultimately intended to be used as medicine. The record does not, however, convincingly support the assertion that *all* of the marijuana was destined to be used as medicine rather than for recreational purposes. Given the absence of inventory controls and the absence of clear-cut distribution commitments, it is hard to conclude that all of the inventory would have found its way exclusively for medicinal purposes.

Nonetheless, for purposes of the legal issue presented, it may be assumed, contrary to the finding made above, that *all* of the marijuana *was* firmly destined for qualified sick patients. The policy statement issued by the Sentencing Commission and quoted above cautions that if the

federal interest in deterrence would be compromised, then no downward departure should be granted on the ground of attempting to avoid a greater harm. As phrased by the policy statement, the question becomes whether "the circumstances significantly diminish society's interest in punishing the conduct." The Court must, therefore, consider whether the requested downward departure would compromise the federal interest in preventing the type of conduct at issue.

All defendants, of course, knew then and know now that federal law has long prohibited marijuana, period. As stated, that was stipulated to at the time of the guilty pleas. While state law is diametrically opposite federal law on the issue of medical marijuana, federal law has been absolute and clear at all times. The clash in the two policies has been well-known, an issue decided in a well-publicized case by the United States Supreme Court before the arrests were made in this case. In *United States v. Oakland Cannabis Buyers' Cooperative*, 532 U.S. 483, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001), the Supreme Court held that California's "medicinal marijuana" was not a legally cognizable defense to the federal prohibition against manufacturing and distribution of marijuana under 21 U.S.C. 841(a)(1). The Court held "that medical necessity is not a defense to manufacturing and distributing marijuana." 532 U.S. at 494, 121 S.Ct. 1711.

Perhaps, as many sincerely argue and truly believe, the federal law is misguided. Medical opinion is honestly divided over the issue. Dissenters have mounted arguments to relax the law that are at least worthy of consideration. Meanwhile, our Congress has flatly outlawed marijuana in this country, nationwide, including for medicinal purposes. The Sentencing Commission has never recognized medical marijuana as a basis for relief from sentence.

In any conflict between federal and state policy, the federal view must prevail supreme under our system.

We are dealing here with a willful violation of federal law. To allow a reduced sentence for medical marijuana grown in willful violation of federal law would, by reducing the penalty, reduce the deterrent effect and thereby undermine the federal interest in eradicating all forms of marijuana, medical or otherwise. In effect, defendants' argument reduces to the proposition that all those involved in medical-marijuana distribution in California and elsewhere, in willful violation of federal law, should receive a lenient federal sentence. To do so, however, would pose a substantial risk of encouraging the very type of conduct Congress has sought to stop. Accordingly, the policy statement quoted above specifically bars the requested departure.

It is true that the First Circuit in *United States v. Carvell*, 74 F.3d 8 (1st Cir. 1996), approved a downward departure from seventy to sixty months in a marijuana case. There, the defendant grew and used marijuana to avoid major depression and a serious risk of suicide. The main holding of the case was that a departure was not barred by Section 5H1.4 merely because the defendant was dependent on illegal drugs. The suicide problem, the First Circuit noted, had not been caused by drug addiction but was an independent problem. With respect to the issue of deterrence and the policy statement, the issue of immediate concern here, the First Circuit concluded that the federal interest in deterrence was not affected. Where the alternative was suicide, the federal interest in deterrence of drug cultivation could reasonably be thought to be reduced, the court stated. The present case, however, does not involve a suicide risk. That makes the decision inapplicable. Nor, moreover, did the First Circuit consider

the present problem of a large-scale operation involving at least 1,245 plants, as here. In no way did the First Circuit bless the proposition that all those involved in the distribution of medical marijuana in willful violation of federal law should receive leniency. Consequently, the *Carvell* decision does not overcome the clear admonition of the Sentencing Commission to avoid dilution of the interest in deterrence. The motion for downward departure must be **DENIED** under the policy statement.

\* \* \* \* \* \*

██ This brings us to one last point of possible downward departure. Four years ago, Ms. Landa was hit by a car and thrown against its windshield while crossing a street. She suffered a dislocated shoulder and was bedridden for six months. She underwent surgery. Ten corkscrews were used to re-attach muscles in her shoulder with the result that use of her arm has been largely restricted. Additionally, her rotator cuff was split and her front tooth was knocked out. She has permanent nerve damage in the neck. She has been in and out of surgery and therapy and consultation for yet more surgery. It is true that most of her medical needs could be met by the Bureau of Prisons. Nonetheless, given Ms. Landa's ongoing and serious need for specialized medical attention and the likelihood that her need for close medical attention will continue into the future, the Court concludes that a two-level downward departure is warranted (U.S.S.G. § 5H1.4, p.s.), at least when this factor is considered in combination with Ms. Landa's responsibilities for her teenage son and elderly parents. This reduces her guideline range to 41 to 51 months. Beyond that, her motion must be deemed as not presenting extraordinary circumstances.

\* \* \* \* \* \*

To summarize, defendants have all entered into plea agreements that called for sentencing at offense level 23. For the reasons stated, the indicated ranges have been reduced but have not been reduced based upon the medical-marijuana theory of this case. The ranges for each of the defendants are as follows:

| DEFENDANT | ADJUSTED OFFENSE LEVEL AND CRIMINAL HISTORY | RANGE |
|---|---|---|
| Thomas Kikuchi | 21—I | 37—46 months |
| Kevin Gage | 23—I | 46—57 months |
| Stephanie Landa | 21—II | 41—51 months |

All defendants shall be sentenced at the low end of their respective ranges. Therefore, Thomas Kikuchi will be sentenced to 37 months and Stephanie Landa to 41 months. The terms of Ms. Landa and Mr. Kikuchi shall be staggered so as to allow them to attend to their teenage son with Mr. Kikuchi serving his term first. In light of the government's concern that Ms. Landa was the most culpable and that her sentence should be no less than any other defendants' sentence, the Court has, *sua sponte*, **GRANTED** a downward departure for Mr. Gage to 41 months to eliminate a disparity in sentencing. All other aspects of the sentencing have been explained on the record.