PEOPLE v REDDEN
PEOPLE v CLARK

Docket Nos. 295809 and 295810. Submitted July 7, 2010, at Detroit. Decided September 14, 2010, at 9:20 a.m.

Robert L. Redden and Torey A. Clark were each charged in the 43rd District Court with manufacturing 20 or more but less than 200 marijuana plants. At their preliminary examination, defendants asserted the affirmative defense provided by § 8 of the Michigan Medical Marihuana Act (MMMA), MCL 333.26428. In support of the defense, defendants presented testimony from Eric Eisenbud, M.D., who had signed authorizations for each defendant, certifying that they were eligible for registration under the act. Eisenbud had examined defendants in March 2009, meeting with each for about a half-hour, including reviewing their medical records, interviewing them, and physically examining them. The examinations occurred after the MMMA took effect but before the Department of Community Health began issuing registry identification cards under the MMMA. Eisenbud did not identify defendants' debilitating medical conditions in his testimony or in the authorizations he signed. Nor did defendants present evidence that the amount of marijuana in their possession was not more than was reasonably necessary for medical purposes, that they were manufacturing marijuana solely for medical purposes, or that they suffered from serious or debilitating medical conditions as defined by MCL 333.26423(a)(2). Although their medical examinations had taken place before their arrests, defendants were not issued registry identification cards until after their arrests. The court, Robert J. Turner, J., dismissed the charges after finding that defendants had established the defense. On appeal, the Oakland Circuit Court, Lisa O. Gorcyca, J., reversed, holding that the district court had abused its discretion by acting as a trier of fact when it denied the bindover and dismissed the charges. The circuit court ruled that the affirmative defense needed to be addressed in the trial court and remanded the case to the district court for further proceedings. Defendants appealed.

The Court of Appeals *held*:

1. The MMMA provides two procedural avenues by which a person facing possible prosecution for violating Michigan's con-

trolled substances laws may seek to establish use of marijuana for medical purposes. Individuals may assert immunity from prosecution under MCL 333.26424 or they may assert an affirmative defense under MCL 333.26428. Thus, even though defendants did not possess registry identification cards at the time of their arrests, the defense provided by the MMMA was available to them, and the district court did not err by permitting them to raise the defense.

2. To establish the medical-purpose defense to a marijuana-related charge, a defendant without a registry identification card must satisfy the elements set forth in MCL 333.26428(a). Specifically, the defendant must show (1) the existence of a bona fide physician-patient relationship in the course of which the physician recommended the use of marijuana to treat or alleviate the patient's serious or debilitating medical condition or the symptoms of the patient's serious or debilitating medical condition, (2) that the amount of marijuana possessed was not more than was reasonably necessary to ensure the uninterrupted availability of marijuana for the purpose of treating or alleviating the patient's condition or symptoms, (3) that the defendant's acquisition, possession, cultivation, manufacture, use, delivery, transfer, or transportation of the specific marijuana from which the charge arose was for the patient's medical purposes, and (4) that the patient had a serious medical condition or had a debilitating medical condition as defined by MCL 333.26423(a). There were colorable issues concerning whether a bona fide physician-patient relationship existed, whether the amount of marijuana defendants possessed was reasonable under the statute, whether the marijuana was being used for medical purposes, and whether defendants had serious or debilitating medical conditions. Thus, the district court erred by concluding that defendants satisfied the requirements of the MMMA as a matter of law, and the circuit court properly reinstated the charges.

Affirmed and remanded.

O'CONNELL, P.J., concurring, agreed with the majority's decision to affirm the circuit court's reinstatement of the charges against defendants, but would interpret the statutory defenses more narrowly. He discussed the history of the act and numerous issues surrounding the interpretation of the MMMA in an attempt to establish a framework for addressing those issues, and urged the legislative and administrative officials authorized to revise the MMMA or its regulations to take action to clarify the act's confusing and conflicting provisions. He also emphasized that the MMMA does not protect the sale of marijuana under any circumstances.

1. CONTROLLED SUBSTANCES — MEDICAL MARIJUANA — CRIMINAL DEFENSES — UNREGISTERED MEDICAL-MARIJUANA USERS.

The Michigan Medical Marihuana Act provides two procedural avenues by which a person facing possible prosecution for a marijuana-related crime may seek to establish use of marijuana for medical purposes; individuals may assert immunity from prosecution under MCL 333.26424 or they may assert an affirmative defense under MCL 333.26428.

2. CONTROLLED SUBSTANCES — CRIMINAL DEFENSES — MEDICAL MARIJUANA — UNREGISTERED MEDICAL-MARIJUANA USERS.

To establish the medical-purpose defense to a marijuana-related charge under the Michigan Medical Marihuana Act, a defendant without a registry identification card must show (1) the existence of a bona fide physician-patient relationship in the course of which the physician recommended the use of marijuana to treat or alleviate the patient's serious or the debilitating medical condition or the symptoms of the patient's serious or debilitating medical condition, (2) that the amount of marijuana possessed was not more than was reasonably necessary to ensure the uninterrupted availability of marijuana for the purpose of treating or alleviating the patient's condition or symptoms, (3) that the defendant's acquisition, possession, cultivation, manufacture, use, delivery, transfer, or transportation of the specific marijuana from which the charge arose was for the patient's medical purposes, and (4) that the patient had a serious medical condition or had a debilitating medical condition as defined in the act (MCL 333.26423[a], 333.26428[a]).

*Michael A. Cox*, Attorney General, *B. Eric Restuccia*, Solicitor General, *Jessica R. Cooper*, Prosecuting Attorney, *John S. Pallas*, Chief, Appellate Division, and *Thomas R. Grden*, Assistant Prosecuting Attorney, for the people.

*Robert Mullen and Associates, PLLC* (by *Robert S. Mullen*), for defendants.

Amicus Curiae:

*Dykema Gossett PLLC* (by *Shaun M. Johnson* and *Nadav Ariel*), *Daniel S. Korobkin*, *Michael J. Steinberg*, and *Kary L. Moss* for the American Civil Liberties Union Fund of Michigan.

Before: O'CONNELL, P.J., and METER and OWENS, JJ.

METER, J. In this case involving the Michigan Medical Marihuana Act (MMMA), MCL 333.26421 *et seq.*, defendant Robert Lee Redden and defendant Torey Alison Clark appeal by leave granted a December 10, 2009, circuit court order reversing for each defendant the district court's dismissal of a single count of manufacturing 20 or more but less than 200 marijuana plants, MCL 333.7401(2)(d)(*ii*). We affirm the circuit court's decision to reinstate the charges.

## I. FACTS

This case arose from the execution of a search warrant at defendants' residence in Madison Heights, which resulted in the discovery of approximately 1½ ounces of marijuana and 21 marijuana plants. Officer Kirk Walker and Officer Mark Moine of the Madison Heights Police Department testified that in the evening of March 30, 2009, they arrived at the residence with three other officers to execute a search warrant for the purpose of looking for marijuana and other illegal substances.

Defendants and another unidentified individual were found in the residence and were secured by the officers. The officers found proof of residency for defendants and $531 in cash. The officers also found three bags of marijuana in a bedroom. In addition, they found 21 marijuana plants, which were all between three and four inches tall, on the floor of a closet in the same bedroom. Field tests of these items were positive for marijuana. The officers did not find any scales, small plastic bags, or packaging materials in the residence.

At some point during the search, Redden stated that he was in pain. Defendants also each turned over

documents regarding their use of marijuana for medical purposes. The documents, which were dated March 3, 2009, for Redden, and March 4, 2009, for Clark, were admitted into evidence. Each document stated:

> I, Eric Eisenbud, MD, am a physician, duly licensed in the State of Michigan. I have completed a full assessment of this patient's medical history, and I am treating this patient for a terminal illness or a debilitating condition as defined in Michigan's medical marijuana law. I completed a full assessment of this patient's current medical condition. This assessment was made in the course of a bona fide physician-patient relationship. I have advised the patient about the potential risks and benefits of the medical use of marijuana. I have formed my professional opinion that the potential benefits of the medical use of marijuana would likely outweigh any health risks for the patient. This patient is LIKELY to receive therapeutic or palliative benefit from the medical use of marijuana to treat or alleviate a serious or debilitating medical condition or symptoms of the serious or debilitating medical condition.

The MMMA went into effect on December 4, 2008, but, according to Walker, the state of Michigan did not begin issuing registry identification cards until April 4, 2009. The Michigan Department of Community Health issued medical-marijuana registry identification cards to each defendant on April 20, 2009, but this was after the search in this case took place.

In the course of the preliminary examination, defendants asserted the affirmative defense contained in § 8 of the MMMA, MCL 333.26428.[1] In support of the

---

[1] MCL 333.26428, which is quoted in its entirety later in this opinion, states that a medical-purpose defense shall be presumed valid if, among other things,

> [a] physician has stated that, in the physician's professional opinion, after having completed a full assessment of the patient's medical history and current medical condition made in the course

defense, defendants presented testimony from Eric Eisenbud, M.D., who testified that he had attended the University of Colorado's medical school and had been a physician for 37 years. He was licensed to practice in seven states, including Michigan, and was board-certified in ophthalmology. Dr. Eisenbud also had worked in the past as an emergency room practitioner and a family practitioner. At the time of the preliminary examination, Dr. Eisenbud had worked for the past 19 months for The Hemp and Cannabis Foundation (THCF) Medical Clinic. He testified that he is "not from Michigan" and was currently working in six out of the seven states in which he was licensed to practice medicine, although he later suggested that he was working in all seven states.[2]

Dr. Eisenbud testified that defendants were his patients and that he examined each of them on March 3, 2009, when both were seeking to be permitted to use marijuana under the MMMA. A clinic technician screened defendants before their appointment in a telephone interview and by reviewing their medical records. Dr. Eisenbud met with each defendant for about a half-hour, spending 5 minutes reviewing the medical records and about 10 minutes on the physical examination; he also interviewed them. During their 10-minute physical examinations, Dr. Eisenbud examined both defendants' general appearance and skin, listened to their lungs, examined their abdomens, ex-

of a bona fide physician-patient relationship, the patient is likely to receive therapeutic or palliative benefit from the medical use of marihuana to treat or alleviate the patient's serious or debilitating medical condition or symptoms of the patient's serious or debilitating medical condition[.] [MCL 333.26428(a)(1).]

[2] We note that Dr. Eisenbud did not indicate where his "home base" is, he did not indicate where his examinations of defendants took place, and he did not indicate where the TCHF Medical Clinic is located.

amined their heads and necks, did a neurological and cardiovascular assessment, and assessed their mental health.

Dr. Eisenbud testified that he signed the authorization for each defendant in his professional capacity because each qualified under the MMMA and each would benefit medically from using marijuana. He opined that his relationship with each defendant was a bona fide physician-patient relationship because he interviewed defendants, examined them, and looked at their medical records in order to gain a full understanding of their medical problems. Dr. Eisenbud acknowledged that the THCF Medical Clinic did not require patients to bring their complete medical records. The records from Redden were from two years before his examination by Dr. Eisenbud, and Clark's records were from a year before her examination by Dr. Eisenbud.

Regarding Redden, Dr. Eisenbud concluded that he had a debilitating condition that caused pain, satisfying the MMMA's requirements. Regarding Clark, Dr. Eisenbud concluded from her medical records and interviewing her that she suffered from nausea. Dr. Eisenbud did not testify regarding what caused Redden's pain or Clark's nausea. Dr. Eisenbud only examined each defendant once. He viewed the only risk of defendants' using marijuana as related to driving; he indicated that they should not drive within four hours of using it.

Dr. Eisenbud testified that defendants had not consulted with any other doctors regarding medical-marijuana authorization before their appointments with him. According to Dr. Eisenbud, both defendants were using other narcotics for their conditions, and he opined that access to marijuana would give them the opportunity to wean themselves off of those narcotics.

The parties stipulated that Redden had two previous convictions for possession of marijuana with intent to distribute.

During the preliminary examination, the prosecution argued that defendants were not entitled to assert the affirmative defense from § 8 of the MMMA because neither had a registry identification card at the time of the offense as required by § 4(a) of the MMMA, MCL 333.26424(a).[3] The prosecution acknowledged that defendants could not have obtained a card previously because the state had yet to begin issuing them. However, the prosecution contended that defendants were required to abstain from marijuana use until they were able to obtain a card. Defendants argued that the plain language of § 8 of the MMMA did not require possession of a card.

The prosecution argued that under the probable-cause standard, the evidence showed that defendants were engaged in manufacturing marijuana. The prosecution contended that defendants had failed to comply with § 8 of the MMMA because they had not shown a bona fide patient-physician relationship with Dr. Eisenbud and also had failed to establish that they possessed

---

[3] MCL 333.26424(a) provides:

A qualifying patient who has been issued and possesses a registry identification card shall not be subject to arrest, prosecution, or penalty in any manner, or denied any right or privilege, including but not limited to civil penalty or disciplinary action by a business or occupational or professional licensing board or bureau, for the medical use of marihuana in accordance with this act, provided that the qualifying patient possesses an amount of marihuana that does not exceed 2.5 ounces of usable marihuana, and, if the qualifying patient has not specified that a primary caregiver will be allowed under state law to cultivate marihuana for the qualifying patient, 12 marihuana plants kept in an enclosed, locked facility. Any incidental amount of seeds, stalks, and unusable roots shall also be allowed under state law and shall not be included in this amount.

an amount of marijuana that was not more than was reasonably necessary to ensure uninterrupted availability for the purpose of treating their conditions. Defendants argued that they met the requirements of § 8 because each had a signed authorization from a licensed physician with whom he or she had a bona fide physician-patient relationship and who concluded that each had conditions covered under the MMMA. Defendants also argued that the amount of marijuana was reasonably necessary.

## II. LOWER-COURT RULINGS

The district court noted that the MMMA "is probably one of the worst pieces of legislation I've ever seen in my life" and went on to state:

[S]ection 8 says section 4 doesn't really have any meaning. If you don't have a card and you happen to be arrested, just make sure you have a doctor who will testify in court that you needed medical marijuana in order to have that case dismissed.

The burden's on defendant at the evidentiary hearing to have section 8 apply to show what a reasonable amount of marijuana is. It doesn't say what a reasonable amount is. It would seem practical to me that they would have included the same amount that was in section 4 if they believed that was a reasonable amount. But, instead, they just leave it to, I guess, every other judge's decision as to what they think is reasonable.

It—it's just one of the worst pieces of legislation I've ever seen. . . . [I]t appears that section 8, the intent of it is to allow anyone who possesses marijuana with a doctor's certification, I guess at the time of a hearing, that the case would have to be dismissed. Because it very clearly says in section [8]b that the charges shall be dismissed following an evidentiary hearing where the person shows the ele-

ments listed in subsection A. Well, one of the elements in subsection A is possessing a reasonable quantity of marijuana.

I still don't know what a reasonable quantity of marijuana is unless I go to section 4. Section 4 says, 2-point-5 ounces, I believe, 12 plants, but you also have to have a valid registration card.

So, these people possessed no registration card, but yet they want the benefit of section 4 to apply to section 8.

The district court also noted that although Dr. Eisenbud testified regarding defendants' legitimate need to use marijuana for medical purposes, there was no testimony regarding what was a reasonably necessary amount for defendants to possess. The district court concluded that it would simply apply the amount of 2.5 ounces and 12 plants set by § 4 as what was reasonably necessary, and it granted defendants' motion to dismiss, explaining:

For that reason, I believe that section 8 entitles the defendants to a dismissal, even though they did not possess the valid medical card, because section 8 says if they can show the fact that a doctor believed they were likely to receive the therapeutic benefit, and this doctor testified to that. And Doctor Eisenbud is a physician, licensed by the State of Michigan. And that's the only requirement that the statute has. You don't have to be any type of physician, you just have to be a licensed physician by the State of Michigan.

So, based on that, I find section 8 does apply. And I believe I'm obligated to dismiss this matter based on section 8 of the statute.

Regarding the prosecution's request for a clarification of whether the doctor's testimony rose to the level of establishing a bona fide physician-patient relationship, the district court stated:

> Based on his testimony, he indicated that he—he read
> their medical records, he saw them, and I think his total
> time was about a half an hour totally spent with them,
> which, based on my own personal experience, I don't find
> inconsistent with my own doctor. So I guess that's a bona
> fide relationship.

The district court entered an order of dismissal on July
17, 2009.

The prosecution appealed the order of dismissal in
the circuit court. On December 18, 2009, the circuit
court issued an opinion and order reversing the district
court's order and remanding the case to the district
court for further proceedings. The circuit court ruled
that the district court had abused its discretion by not
binding defendants over for trial because it had improp-
erly acted as a trier of fact. The circuit court ruled that,
in this case, the affirmative defense must be addressed
in the trial court in order for proper discovery and
rebuttal to take place.

The circuit court also considered questionable the
issue regarding whether defendants should be allowed
to raise the affirmative defense at all, because defen-
dants did not have valid registry identification cards as
required by § 4 of the MMMA, together possessed more
than the amount of marijuana permitted under § 4, and
did not keep their marijuana plants in "an enclosed,
locked facility," which is also required under § 4.

The circuit court then emphasized that there was a
disputed question regarding whether Dr. Eisenbud had
a bona fide physician-patient relationship with defen-
dants. The circuit court concluded:

> [T]here was competent evidence in support of the bin-
> dover. For the district judge to deny the bindover was an
> abuse of discretion. Specifically, the district judge failed to
> properly exercise his judgment by relying solely on Dr.

Eisenbud's testimony, and by ignoring the evidence presented by the People regarding Defendants' actions that showed they did not meet the criteria of the affirmative defense. The evidence in support of the affirmative defense was not developed sufficiently to support the district judge's decision to deny the bindover.

### III. A REGISTRY IDENTIFICATION CARD IS NOT REQUIRED FOR A § 8 DEFENSE

Defendants argue that the circuit court erred by ruling that because defendants did not obtain registry identification cards in order to satisfy the conditions of § 4 of the MMMA, they could not assert the affirmative defense contained in § 8.[4]

#### A. STANDARD OF REVIEW

This issue presents a question of statutory interpretation. We review de novo issues of statutory interpretation. *People v Stone Transp, Inc*, 241 Mich App 49, 50; 613 NW2d 737 (2000). Generally, the primary objective in construing a statute is to ascertain and give effect to the Legislature's intent. *People v Williams,* 475 Mich 245, 250; 716 NW2d 208 (2006). The MMMA was enacted as a result of an initiative adopted by the voters. "The words of an initiative law are given their ordinary and customary meaning as would have been understood by the voters." *Welch Foods, Inc v Attorney General*, 213 Mich App 459, 461; 540 NW2d 693 (1995). We presume that the meaning as plainly expressed in the statute is what was intended. *Id.* This Court must avoid a construction that would render any part of a statute surplusage or nugatory, and "[w]e must con-

---

[4] The circuit court's ruling was somewhat ambiguous with regard to this issue; it stated that "it is questionable whether Defendants are entitled to assert the affirmative defense contained in the MMMA."

sider both the plain meaning of the critical words or phrases as well as their placement and purpose in the statutory scheme." *People v Williams*, 268 Mich App 416, 425; 707 NW2d 624 (2005).

### B. ANALYSIS

This issue involves §§ 4, 7, and 8 of the MMMA. Section 4 provides, in relevant part:

> (a) A qualifying patient who has been issued and possesses a registry identification card shall not be subject to arrest, prosecution, or penalty in any manner, or denied any right or privilege, including but not limited to civil penalty or disciplinary action by a business or occupational or professional licensing board or bureau, for the medical use of marihuana in accordance with this act, provided that the qualifying patient possesses an amount of marihuana that does not exceed 2.5 ounces of usable marihuana, and, if the qualifying patient has not specified that a primary caregiver will be allowed under state law to cultivate marihuana for the qualifying patient, 12 marihuana plants kept in an enclosed, locked facility. Any incidental amount of seeds, stalks, and unusable roots shall also be allowed under state law and shall not be included in this amount.

> \* \* \*

> (c) A person shall not be denied custody or visitation of a minor for acting in accordance with this act, unless the person's behavior is such that it creates an unreasonable danger to the minor that can be clearly articulated and substantiated.

> (d) There shall be a presumption that a qualifying patient or primary caregiver is engaged in the medical use of marihuana in accordance with this act if the qualifying patient or primary caregiver:

> (1) is in possession of a registry identification card; and

(2) is in possession of an amount of marihuana that does not exceed the amount allowed under this act. The presumption may be rebutted by evidence that conduct related to marihuana was not for the purpose of alleviating the qualifying patient's debilitating medical condition or symptoms associated with the debilitating medical condition, in accordance with this act.[5] [MCL 333.26424.]

## Section 8 provides:

(a) Except as provided in section 7 [MCL 333.26427], a patient and a patient's primary caregiver, if any, may assert the medical purpose for using marihuana as a defense to any prosecution involving marihuana, and this defense shall be presumed valid where the evidence shows that:

(1) A physician has stated that, in the physician's professional opinion, after having completed a full assessment of the patient's medical history and current medical condition made in the course of a bona fide physician-patient relationship, the patient is likely to receive therapeutic or palliative benefit from the medical use of marihuana to treat or alleviate the patient's serious or debilitating medical condition or symptoms of the patient's serious or debilitating medical condition;

(2) The patient and the patient's primary caregiver, if any, were collectively in possession of a quantity of marihuana that was not more than was reasonably necessary to ensure the uninterrupted availability of marihuana for the purpose of treating or alleviating the patient's serious or debilitating medical condition or symptoms of the patient's serious or debilitating medical condition; and

(3) The patient and the patient's primary caregiver, if any, were engaged in the acquisition, possession, cultivation, manufacture, use, delivery, transfer, or transportation of marihuana or paraphernalia relating to the use of marihuana to treat or alleviate the patient's serious or

---

[5] It is not clear how the immunity from arrest provided in § 4(a) interplays with the rebuttable presumption in § 4(d)(2). However, that issue is not before the Court today.

debilitating medical condition or symptoms of the patient's serious or debilitating medical condition.

(b) A person may assert the medical purpose for using marihuana in a motion to dismiss, and the charges shall be dismissed following an evidentiary hearing where the person shows the elements listed in subsection (a).

(c) If a patient or a patient's primary caregiver demonstrates the patient's medical purpose for using marihuana pursuant to this section, the patient and the patient's primary caregiver shall not be subject to the following for the patient's medical use of marihuana:

(1) disciplinary action by a business or occupational or professional licensing board or bureau; or

(2) forfeiture of any interest in or right to property. [MCL 333.26428.]

As an initial matter, the plain language of § 8 does not place any restriction on defendants' raising of the affirmative defense. Nevertheless, the prosecution argues that the affirmative defense under § 8 is unavailable to defendants because they did not possess valid registry identification cards at the time of the offense, in violation of § 4. The prosecution bases its position on the language in § 8(a) that provides: *"Except as provided in section 7,* a patient and a patient's primary caregiver, if any, may assert the medical purpose for using marihuana as a defense to any prosecution involving marihuana, and this defense shall be presumed valid . . . ." MCL 333.26428(a) (emphasis added).

Section 7(b) provides a host of instances for which the protection of the affirmative defense under § 8 would not be permitted, but none of those situations is at issue in this case. See MCL 333.26427(b).[6] However, the prosecution points to § 7(a), which provides that "[t]he medical use of marihuana is allowed under state

---

[6] Section 7 states:

law to the extent that it is carried out in accordance

(a) The medical use of marihuana is allowed under state law to the extent that it is carried out in accordance with the provisions of this act.

(b) This act shall not permit any person to do any of the following:

(1) Undertake any task under the influence of marihuana, when doing so would constitute negligence or professional malpractice.

(2) Possess marihuana, or otherwise engage in the medical use of marihuana:

(A) in a school bus;

(B) on the grounds of any preschool or primary or secondary school; or

(C) in any correctional facility.

(3) Smoke marihuana:

(A) on any form of public transportation; or

(B) in any public place.

(4) Operate, navigate, or be in actual physical control of any motor vehicle, aircraft, or motorboat while under the influence of marihuana.

(5) Use marihuana if that person does not have a serious or debilitating medical condition.

(c) Nothing in this act shall be construed to require:

(1) A government medical assistance program or commercial or non-profit health insurer to reimburse a person for costs associated with the medical use of marihuana.

(2) An employer to accommodate the ingestion of marihuana in any workplace or any employee working while under the influence of marihuana.

(d) Fraudulent representation to a law enforcement official of any fact or circumstance relating to the medical use of marihuana to avoid arrest or prosecution shall be punishable by a fine of $500.00, which shall be in addition to any other penalties that may

with the provisions of this act." MCL 333.26427(a). The prosecution contends that this section justifies its position that § 4 must be adhered to in order for a defendant to invoke § 8 because the affirmative defense is only available to a defendant who complies with the other provisions of the MMMA.

However, as defendants argue, this position ignores that the MMMA provides two ways in which to show legal use of marijuana for medical purposes in accordance with the act. Individuals may either register and obtain a registry identification card under § 4 or remain unregistered and, if facing criminal prosecution, be forced to assert the affirmative defense in § 8.

The plain language of the MMMA supports this view. Section 4 refers to a "qualifying patient who has been issued and possesses a registry identification card" and protects a qualifying patient from "arrest, prosecution, or penalty in any manner . . . ."[7] MCL 333.26424(a). On the other hand, § 8(a) refers only to a "patient," not a qualifying patient, and only permits a patient to "assert the medical purpose for using marihuana as a defense to any prosecution involving marihuana . . . ." MCL 333.26428(a). Thus, adherence to § 4 provides protection that differs from that of § 8. Because of the differing levels of protection in §§ 4 and 8, the plain language of the statute establishes that § 8 is applicable for a patient who does not satisfy § 4.

---

apply for making a false statement or for the use of marihuana other than use undertaken pursuant to this act.

(e) All other acts and parts of acts inconsistent with this act do not apply to the medical use of marihuana as provided for by this act. [MCL 333.26427.]

[7] A "[q]ualifying patient" is defined as "a person who has been diagnosed by a physician as having a debilitating medical condition." MCL 333.26423(h).

The language of the ballot proposal itself supports this interpretation. The ballot proposal, Proposal 08-1, stated that the law would do the following:

- Permit physician approved use of marijuana by registered patients with debilitating medical conditions including cancer, glaucoma, HIV, AIDS, hepatitis C, MS and other conditions as may be approved by the Department of Community Health.
- Permit registered individuals to grow limited amounts of marijuana for qualifying patients in an enclosed, locked facility.
- Require Department of Community Health to establish an identification card system for patients qualified to use marijuana and individuals qualified to grow marijuana.
- *Permit registered and unregistered patients* and primary caregivers *to assert medical reasons for using marijuana* as a defense to any prosecution involving marijuana. [Emphasis added.]

The ballot proposal explicitly informed voters that the law would permit registered *and* unregistered patients to assert medical reasons for using marijuana as a defense to any prosecution involving marijuana. The language supports the view that registered patients under § 4 and unregistered patients under § 8 would be able to assert medical use of marijuana as a defense. Accordingly, we hold that the district court did not err by permitting defendants to raise the affirmative defense even though neither satisfied the registry-identification-card requirement of § 4.[8]

---

[8] Although defendants do not raise this as an issue on appeal, the prosecution argues that a § 8 defense was not viable because the marijuana in question was not kept in an "enclosed, locked facility." We note that the language concerning an "enclosed, locked facility" is set forth in the context of § 4, not in the context of § 8. MCL 333.26424(a). Nevertheless, as with the discovery issue mentioned in footnote 11, we decline to address this issue without the benefit of full briefing by the parties. Presumably further proceedings will take place with regard to this issue.

IV. THE CIRCUIT COURT PROPERLY REVERSED
THE BINDOVER DECISION

Defendants next contend that the circuit court erred by holding that the district court was precluded from ruling that defendants' manufacturing marijuana was permitted under the MMMA. We find no basis on which to reverse the circuit court's disposition because there are indeed triable issues in this case and the district court improperly acted as a trier of fact in denying the bindover.

A. STANDARD OF REVIEW

"A district court's ruling that alleged conduct falls within the scope of a criminal law is a question of law that is reviewed de novo for error, but a decision to bind over a defendant based on the factual sufficiency of the evidence is reviewed for an abuse of discretion." *People v Henderson*, 282 Mich App 307, 312; 765 NW2d 619 (2009). When reviewing the bindover decision, a circuit court must consider the entire record of the preliminary examination and not substitute its judgment for that of the district court. *Id.* at 312-313. This Court reviews de novo the bindover decision to determine whether the district court abused its discretion, giving no deference to the circuit court's decision. *Id.* at 313.

B. ANALYSIS

"The primary function of a preliminary examination is to determine if a crime has been committed and, if so, if there is probable cause to believe that the defendant committed it." *People v Glass (After Remand)*, 464 Mich 266, 277; 627 NW2d 261 (2001). Probable cause is established by evidence "sufficient to cause a person of ordinary prudence and caution to conscientiously enter-

tain a reasonable belief of the accused's guilt." *People v Yost*, 468 Mich 122, 126; 659 NW2d 604 (2003) (citation and quotation marks omitted). In order to establish that a crime has been committed, the prosecution need not prove each element beyond a reasonable doubt, but must present some evidence of each element. See *id*. If the evidence conflicts or raises a reasonable doubt concerning the defendant's guilt, the defendant should nevertheless be bound over for trial, at which the trier of fact can resolve the questions. *Id*. at 128.

This Court has recognized "that affirmative defenses in criminal cases should typically be presented and considered at trial and that a preliminary examination is not a trial." *People v Waltonen*, 272 Mich App 678, 690 n 5; 728 NW2d 881 (2006). In *Waltonen*, this Court went on to note that in a situation in which the defense is complete and there are no conflicting facts regarding the defense, it could be argued that there would be no probable cause to believe a crime had been committed. *Id*.

The district court must consider not only the weight and competency of the evidence, but also the credibility of the witnesses, and it may consider evidence in defense.[9] *People v King*, 412 Mich 145, 153; 312 NW2d 629 (1981). As noted, however, the district court cannot discharge a defendant if the evidence conflicts or raises reasonable doubt concerning a defendant's guilt because this presents an issue for the trier of fact. *Id*. at 153-154.

There was evidence in this case that the defense was *not* complete, cf. *Waltonen*, 272 Mich App at 690 n 5, and

---

[9] With regard to preliminary examinations, MCL 766.12 permits "witnesses for the prisoner, if he [has] any, [to] be sworn, examined and cross-examined," and MCR 6.110(C) permits "[e]ach party [to] subpoena witnesses, offer proofs, and examine and cross-examine witnesses at the preliminary examination."

there were colorable issues for the trier of fact, see *King*, 412 Mich at 153-154. Specifically, we conclude that there were colorable issues concerning whether a bona fide physician-patient relationship existed, whether the amount of marijuana defendants possessed was reasonable under the statute, whether the marijuana in question was being used for medical purposes, and whether defendants suffered from serious or debilitating medical conditions.

### 1. BONA FIDE PHYSICIAN-PATIENT RELATIONSHIP

MCL 333.26428(a)(1) states that a medical-purpose defense shall be presumed valid if, among other requirements,

> [a] physician has stated that, in the physician's professional opinion, *after having completed a full assessment of the patient's medical history and current medical condition made in the course of a bona fide physician-patient relationship*, the patient is likely to receive therapeutic or palliative benefit from the medical use of marihuana to treat or alleviate the patient's serious or debilitating medical condition or symptoms of the patient's serious or debilitating medical condition[.]

We conclude that there was evidence in this particular case that the doctor's recommendations did not result from assessments made in the course of bona fide physician-patient relationships.[10] Dr. Eisenbud testified that he was board-certified in ophthalmology. He answered, "That's right," when asked the following ques-

---

[10] We reject defendants' argument that the prosecution waived the issue concerning whether a bona fide physician-patient relationship existed. First, the prosecution clearly did raise the issue below. Second, the district court had a duty to determine whether there was an issue for trial; in doing so, it was obligated to review § 8 in its entirety to determine whether any triable issues existed.

tion: "So, your sole employment, at this point, is to review people to see whether or not you think they can have marijuana under the Michigan Medical Marijuana—or any other medical marijuana law, correct?" He testified that he saw Clark and Redden once each and was currently working in at least six states. He refused to divulge what defendants' debilitating medical conditions were. Dr. Eisenbud indicated that he was not scheduled to see defendants again until they were due to renew their documentation for using marijuana for medical purposes.

The MMMA does not define the phrase "bona fide physician-patient relationship." When words or phrases are not defined in a statute, a dictionary may be consulted. *People v Peals*, 476 Mich 636, 641; 720 NW2d 196 (2006). *Random House Webster's College Dictionary* (1997) defines "bona fide" as "1. made, done, etc., in good faith; without deception or fraud. 2. authentic; genuine; real." We do not intend to legislate from the bench and define exactly what must take place in order for a bona fide physician-patient relationship to exist. We do conclude, however, that the specific facts in this case, as set forth in the previous paragraph, were sufficient to raise an issue for the trier of fact concerning whether the doctor's recommendations resulted from assessments made in the course of bona fide physician-patient relationships between Dr. Eisenbud and each defendant. Indeed, the facts at least raise an inference that defendants saw Dr. Eisenbud not for good-faith medical treatment but in order to obtain marijuana under false pretenses. Accordingly, the district court erred by finding as a matter of law that defendants had satisfied all the requirements for a § 8 defense.

### 2. AMOUNT OF MARIJUANA POSSESSED

MCL 333.26428(a)(2) states that the § 8 affirmative defense will not be presumed valid unless

[t]he patient and the patient's primary caregiver, if any, were collectively in possession of a quantity of marihuana that was not more than was reasonably necessary to ensure the uninterrupted availability of marihuana for the purpose of treating or alleviating the patient's serious or debilitating medical condition or symptoms of the patient's serious or debilitating medical condition . . . .

There was no testimony or evidence presented regarding whether the amount of marijuana possessed by defendants was "not more than was reasonably necessary to ensure the uninterrupted availability of marihuana for the purpose of treating or alleviating the patient's . . . condition or symptoms . . . ." *Id.* Defendants were found in possession of approximately 1½ ounces of marijuana and 21 marijuana plants. The district court addressed this element of the affirmative defense and concluded that because the amount of marijuana, when divided between defendants, was less than that of the 2½ ounces and 12 marijuana plants permitted under § 4, this portion of the affirmative defense was satisfied.

However, the plain language of the statute does not support that the amount stated in § 4 is equivalent to the "reasonably necessary" amount under § 8(a)(2). Indeed, if the intent of the statute were to have the amount in § 4 apply to § 8, the § 4 amount would have been reinserted into § 8(a)(2), instead of the language concerning an amount "reasonably necessary to ensure . . . uninterrupted availability . . . ." MCL 333.26428(a)(2). Without any evidence on this element of the affirmative defense, the district court could not have properly found the affirmative defense established as a matter of law. There was a colorable question of fact concerning whether the amount possessed was in accordance with the statute.

### 3. PURPOSE OF THE MARIJUANA IN QUESTION

MCL 333.26428(a)(3) indicates that, for the medical-purpose defense to be valid, evidence must show that

[t]he patient and the patient's primary caregiver, if any, were engaged in the acquisition, possession, cultivation, manufacture, use, delivery, transfer, or transportation of marihuana or paraphernalia relating to the use of marihuana to treat or alleviate the patient's serious or debilitating medical condition or symptoms of the patient's serious or debilitating medical condition.

There was testimony and evidence that Redden and Clark could benefit from the medical use of marijuana. However, although an inference could be made that the specific marijuana they allegedly manufactured was being manufactured for medical purposes, there was no explicit testimony or other evidence establishing this fact. Therefore, we find that there was considerable doubt concerning whether defendants satisfied this portion of the defense, see *King*, 412 Mich at 153-154, and the district court therefore should not have concluded that the defense was established as a matter of law.

### 4. SERIOUS OR DEBILITATING MEDICAL CONDITIONS

Dr. Eisenbud did not identify the nature of defendants' debilitating medical conditions beyond stating that Redden had "pain" and Clark had "nausea." Section § 7(b)(5) states that the MMMA "shall not permit any person to . . . [u]se marihuana if that person does not have a serious or debilitating medical condition." MCL 333.26427(b)(5). Section 3, the definitional section of the MMMA, states in relevant part:

(a) "Debilitating medical condition" means 1 or more of the following:

(1) Cancer, glaucoma, positive status for human immunodeficiency virus, acquired immune deficiency syndrome, hepatitis C, amyotrophic lateral sclerosis, Crohn's disease, agitation of Alzheimer's disease, nail patella, or the treatment of these conditions.

(2) A chronic or debilitating disease or medical condition or its treatment that produces 1 or more of the following: cachexia or wasting syndrome; severe and chronic pain; severe nausea; seizures, including but not limited to those characteristic of epilepsy; or severe and persistent muscle spasms, including but not limited to those characteristic of multiple sclerosis.

(3) Any other medical condition or its treatment approved by the department, as provided for in [MCL 333.26425(a)]. [MCL 333.26423(a).]

Section 3 does not define the phrase "serious medical condition." See MCL 333.26423.

In his written documents, Dr. Eisenbud stated that each defendant was likely to receive benefit from using marijuana to "treat or alleviate a serious or debilitating medical condition . . . ." However, he stated only that he was treating each defendant for "a terminal illness or a debilitating condition as defined in Michigan's medical marijuana law." He then stated at the preliminary examination that Redden had a "debilitating condition." When asked what the condition was, he replied "pain." Dr. Eisenbud stated that Clark's debilitating condition was "nausea."

We conclude that defendants did not establish at the preliminary examination as a matter of law that they had serious or debilitating medical conditions as required by the MMMA. With regard to the phrase "serious medical condition," *Random House Webster's College Dictionary* (1997) defines "serious," in this context, as "weighty, important, or significant" and "giving cause for apprehension; critical or threatening[.]" Without knowing the na-

ture of defendants' medical conditions, it is not possible to determine whether they are "serious." With regard to the phrase "debilitating medical condition," MCL 333.26423(a)(2) indicates that this phrase includes "[a] chronic or debilitating disease or medical condition or its treatment that produces 1 or more of the following: . . . severe and chronic pain; severe nausea . . . ." Dr. Eisenbud indicated that Redden suffered merely from "pain" and that Clark suffered merely from "nausea." This evidence was not sufficient to satisfy the definition set forth in MCL 333.26423(a)(2). The district court therefore erred by concluding that defendants satisfied the requirements of the MMMA as a matter of law. Whether each defendant suffered from a serious or debilitating medical condition is yet another matter for further proceedings.[11]

The circuit court's decision to reverse the district court's bindover ruling is affirmed, and this case is remanded for further proceedings. We do not retain jurisdiction.

OWENS, J., concurred.

O'CONNELL, P.J. (*concurring*). I concur with the majority's decision to affirm the circuit court's decision to reinstate the charges against defendants, but write separately because I interpret the statutory defenses at issue more narrowly than does the majority, and also to elaborate on issues raised in the briefs and at oral argument but not fully addressed by the majority opinion.

---

[11] Defendants tangentially raise the issue regarding whether the prosecution is entitled to discovery of their medical records. The prosecution does not substantively address this argument in its appellate brief. We find that this issue is not currently ripe for review and decline to address it without the benefit of full briefing by the parties. The circuit court was evidently cognizant of the implications of further discovery, and presumably further proceedings will occur with respect to it.

On November 4, 2008, the Michigan Medical Marihuana Act (MMMA), MCL 333.26421 *et seq.*, was passed by initiative and went into effect soon thereafter. It is without question that this act has no effect on federal prohibitions of the possession or consumption of marijuana.[1] The Controlled Substances Act, 21 USC 801 *et seq.*, classifies marijuana as a schedule 1 substance, 21 USC 812(c)(10), meaning that Congress recognizes no acceptable medical uses for it, and its possession is generally prohibited. See *Gonzales v Raich*, 545 US 1, 27; 125 S Ct 2195; 162 L Ed 2d 1 (2005); *United States v Oakland Cannabis Buyers' Coop*, 532 US 483, 491; 121 S Ct 1711; 149 L Ed 2d 722 (2001). As a federal court in Michigan recently recognized, "It is indisputable that state medical-marijuana laws do not, and cannot, supercede federal laws that criminalize the possession of marijuana." *United States v Hicks*, 722 F Supp 2d 829, 833 (ED Mich, 2010), citing *Gonzales*, 545 US at 29 ("The Supremacy Clause unambiguously provides that if there is any conflict between federal and state law, federal law shall prevail."), *United States v $186,416.00 in US Currency*, 590 F3d 942, 945 (CA 9, 2010) ("The federal government has not recognized a legitimate medical use for marijuana, however, and there is no exception for medical marijuana distribution or possession under the federal Controlled Substances Act"), *United States v Scarmazzo*, 554 F Supp 2d 1102, 1109 (ED Cal, 2008) ("Federal law prohibiting the sale of marijuana is valid, despite any state law suggesting medical necessity for marijuana"), and *United States v Landa*, 281 F Supp 2d 1139, 1145 (ND Cal, 2003) ("[O]ur Congress has flatly outlawed marijuana in this

---

[1] "Marijuana" and "marihuana" are both acceptable spellings for the name of this drug. The spelling "marihuana" is used in the Public Health Code, MCL 333.1101 *et seq.*, but "marijuana" is the more commonly used spelling and so will be used throughout this opinion.

country, nationwide, including for medicinal purposes."). Accordingly, "the MMMA has no effect on federal law, and the possession of marijuana remains illegal under federal law, even if it is possessed for medicinal purposes in accordance with state law." *Hicks*, 722 F Supp 2d, at 833, citing *Gonzales*, 545 US at 27 ("The [Controlled Substances Act] designates marijuana as contraband for any purpose[.]").

Further, the MMMA does not create any sort of affirmative *right* under state law to use or possess marijuana. That drug remains a schedule 1 controlled substance under the Public Health Code, MCL 333.7212(1)(c), meaning that "the substance has high potential for abuse and has no accepted medical use in treatment in the United States or lacks accepted safety for use in treatment under medical supervision," MCL 333.7211. The MMMA does not repeal any drug laws contained in the Public Health Code, and all persons under this state's jurisdiction remain subject to them. Accordingly, mere possession of marijuana remains a misdemeanor offense, MCL 333.7403(2)(d), and the manufacture of marijuana remains a felony, MCL 333.7401(2)(d).

Perhaps surprisingly, the purpose of the MMMA is a bit less revolutionary than one might suspect. MCL 333.26422(b) states as follows:

> Data from the Federal Bureau of Investigation Uniform Crime Reports and the Compendium of Federal Justice Statistics show that approximately 99 out of every 100 marihuana arrests in the United States are made under state law, rather than under federal law. Consequently, changing state law will have the practical effect of protecting from arrest the vast majority of seriously ill people who have a medical need to use marihuana.

The MMMA does not codify a *right* to use marijuana; instead, it merely provides a procedure through which seriously ill individuals using marijuana for its palliative effects can be identified and protected from prosecution under state law. Although these individuals are still violating the Public Health Code by using marijuana, the MMMA sets forth particular circumstances under which they will not be arrested or otherwise prosecuted for their lawbreaking. In so doing, the MMMA reflects the practical determination of the people of Michigan that, while marijuana is classified as a harmful substance and its use and manufacture should generally be prohibited, law enforcement resources should not be used to arrest and prosecute those with serious medical conditions who use marijuana for its palliative effects.[2]

Accordingly, the MMMA functions as an affirmative defense to prosecutions under the Public Health Code, allowing an individual to use marijuana by freeing him or her from the threat of arrest and prosecution if that individual meets *all* the requirements of the MMMA, while permitting prosecution under the Public Health Code if the individual fails to meet any of the requirements set forth by the MMMA.[3] See MCL 333.26422(b); MCL 333.26427(e).

The problem, however, is that the MMMA is inartfully drafted and, unfortunately, has created much

---

[2] Again, all individuals who possess, use, or manufacture marijuana in this state, including qualifying patients who have been issued a valid registry identification card and their primary caregivers, are violating the federal Controlled Substances Act and are still subject to arrest and punishment for doing so.

[3] Of course, because the MMMA protects against enforcement of the Public Health Code under only limited circumstances, an individual who is using marijuana must satisfy *all* the requirements of the MMMA or else remain subject to arrest and prosecution for violating the Public Health Code.

confusion regarding the circumstances under which an individual may use marijuana without fear of prosecution. Some sections of the MMMA are in conflict with others, and many provisions in the MMMA are in conflict with other statutes, especially the Public Health Code. Further, individuals who do not have a serious medical condition are attempting to use the MMMA to flout the clear prohibitions of the Public Health Code and engage in recreational use of marijuana. Law enforcement officers, prosecutors, and trial court judges attempting to enforce both the MMMA and the Public Health Code are hampered by confusing and seemingly contradictory language, while healthy recreational marijuana users incorrectly view the MMMA as a de facto legalization of the drug, seemingly unconcerned that marijuana use remains illegal under both state and federal law.

In this opinion, I will attempt to cut through the haze surrounding this legislation. In so doing, I note that neither my opinion nor the majority's opinion constitutes an attempt to *make* the law. We are simply interpreting an act passed by the people of this state. It is up to the Legislature to revise this act as it sees fit.[4]

---

[4] I have no doubt that in the minds of some voters in this state, legalizing marijuana would be good public policy. Others who approved this act were under the impression that the act's specific purpose was limited to permitting the medical use of marijuana by registered patients with debilitating medical conditions. Still others voted against this change in the law. Whether decriminalizing the medical use of marijuana is a good or bad idea for this state is a question of public policy for our state legislators, the executive branch, and the citizenry to ponder. It is not for the courts to set public policy. This Court's responsibility is simply to interpret this act. Citizens of this state wishing for revision of the MMMA should take such appropriate action as attending the public hearings on pertinent pending legislation or communicating with their elected representatives.

### I. GUIDANCE IS NEEDED

In light of the majority opinion's resolution of the issues in this case, one might ask why this concurrence is of any importance. The answer is simple: delay and neglect in addressing the proper scope and application of the MMMA invites and perpetuates error. Judges bear the responsibility of applying, interpreting, and shaping the law, and we neglect this responsibility when we fail to explain, with well-reasoned analysis, our agreement or disagreement with pertinent points of law. Failure to engage in the debate hinders our hunt for a statute's intended purpose and generally stifles the formation of sound legal principles. If we all gently withdrew our voices from the arena of competing ideas, then mistakes would go unchallenged, and the process of correction could suffer nearly insurmountable setbacks.

This case proves the rule. At oral argument and in their briefs, both parties raised numerous questions regarding the proper interpretation of the provisions of the MMMA. It was made clear that many provisions of this act are subject to multiple interpretations and that obfuscating words and phrases in the MMMA have caused much confusion on the part of both law enforcement officials and defense attorneys wishing to advise their clients of their rights and protections under the law. Defense counsel was particularly concerned that the law was not specific enough for him to advise his clients on both the strictures of the MMMA and the ramifications of certain provisions. The prosecuting attorney noted that he was unable to advise municipalities, townships, the police, and others regarding whether particular conduct was permitted or prohibited under the act. More generally, in the absence of clear direction from the appellate courts, many citizens be-

lieve that the MMMA supports and legitimizes the marijuana business.

As defense counsel emphasized at oral argument this Court could take a case-by-case approach to resolving all the issues found in the MMMA, addressing particular provisions piecemeal and in isolation over years and leaving defendants, prosecutors, law enforcement, entrepreneurs, cities, municipalities, townships, and others in a state of confusion for a very, very long time.[5] Or, in one well-thought-out opinion, it could interpret the essential provisions of this act, providing a framework for future application of the new statute and giving fair notice to all regarding the scope of acceptable conduct under the MMMA. Counsel for both parties advised this Court against interpreting the MMMA in a piecemeal fashion because of the confusion that would persist. I agree, and this opinion is my attempt to establish the framework for the law and address those issues not resolved by the majority opinion.

I also agree with counsel that it is the responsibility of this Court to interpret this law in a way that gives

---

[5] Under this piecemeal approach, each case would address a separate, specific issue involving the MMMA. The lower courts of all 83 Michigan counties would then opine on each issue (in some cases arriving at different results). The cases would be appealed to this Court, which would in response issue published opinions binding all trial courts in the state. While this may be an efficient and orderly process for some areas of the law, I suspect that the confusion regarding the circumstances under which an individual using or possessing marijuana is protected from arrest or conviction could result in some citizens losing both their liberty and their property. I am reminded of a statement often attributed to the eighteenth-century British statesman Edmund Burke: "All that is necessary for the triumph of evil is for good men to do nothing." In this case, the evil at issue is the loss of liberty or property suffered by individuals who honestly believe that they are in compliance with the MMMA at the hands of prosecutors and law enforcement officials who honestly believe that they are properly enforcing the clear provisions of the Public Health Code.

fair notice to all concerned regarding what conduct is allowed and what conduct is prohibited under this law. Without some guidance from the appellate courts, the lower courts will continue to stumble about. The system of justice will become hopelessly unpredictable and intolerably frustrating for the people it was established to serve. Right or wrong, we all have the duty to interpret the law to the best of our abilities. Any delay in this process frustrates those citizens who are making a good faith effort to adhere to the law.

## II. ONE STATUTE, COMPETING GOALS

Proposal 1 on the 2008 ballot, which presented the MMMA to the people of this state for a vote, described the proposed MMMA as purporting to do the following:

> • Permit physician approved use of marijuana by registered patients with debilitating medical conditions including cancer, glaucoma, HIV, AIDS, hepatitis C, MS and other conditions as may be approved by the Department of Community Health.
>
> • Permit registered individuals to grow limited amounts of marijuana for qualifying patients in an enclosed, locked facility.
>
> • Require Department of Community Health to establish an identification card system for patients qualified to use marijuana and individuals qualified to grow marijuana.
>
> • Permit registered and unregistered patients and primary caregivers to assert medical reasons for using marijuana as a defense to any prosecution involving marijuana.

Yet in its summary of the intended effect of the MMMA, this ballot proposal obfuscated the more confusing and contradictory aspects of the actual legislation. The

statutory language creates a maze for the reader, making the statute susceptible to multiple interpretations.

The MMMA is based on model legislation provided by the Marijuana Policy Project (MPP), a lobbying group based in Washington, D. C., and organized to decriminalize both the medical *and* recreational uses of marijuana. The statutory language of the MMMA was drafted by Karen O'Keefe, the director of state policies at the MPP in Washington, D.C.[6] Interestingly, the confusion caused by reading the statute piecemeal and out of context has seemed to work to the advantage of those who share the MPP's wish for outright legalization of marijuana. Taking advantage of the confusion from the MMMA, proponents of liberalized marijuana regulations claim that the MMMA legalizes shops that sell marijuana, collective growing facilities, and the cultivation and sale of marijuana as a commercial crop. Further, those individuals who primarily wish to use marijuana recreationally are taking advantage of "pot docs" who will give them written certifications for the medical use of marijuana without bothering to establish either a bona fide physician-patient relationship or the existence of a terminal or debilitating medical condition.

In looking at the specific provisions of the MMMA, it is important to remember that this act is based on a premise—namely, that marijuana can be used for medical purposes—that is in obvious contravention to the Public Health Code. By classifying marijuana as a schedule 1 controlled substance under the Public

---

[6] On its website, the MPP advertises its involvement in the ballot initiative, noting, "Michigan passed MPP's ballot initiative to permit terminally and seriously ill patients to use medical marijuana with their doctors' approval ...." Marijuana Policy Project, Our History <http://www.mpp.org/about/history.html> (accessed September 10, 2010).

Health Code, the people of this state, through their elected representatives, have determined that marijuana "has high potential for abuse and has no accepted medical use in treatment in the United States or lacks accepted safety for use in treatment under medical supervision." MCL 333.7211. This clearly contravenes the rationale for the MMMA, which indicates that provisions should be made to permit seriously ill individuals to use marijuana for medical purposes without fear of arrest because "[m]odern medical research . . . has discovered beneficial uses for marihuana in treating or alleviating the pain, nausea, and other symptoms associated with a variety of debilitating medical conditions." MCL 333.26422(a).

The obvious solution to this problem would simply be to amend the Public Health Code to make marijuana a schedule 2 or schedule 3 controlled substance.[7] With such an amendment, state law would not prohibit a licensed prescriber from prescribing marijuana if, in the prescriber's professional opinion, the drug would effectively treat the pain, nausea, and other symptoms associated with certain debilitating medical conditions. MCL 333.7303a. Curiously, however, the MMMA has no provisions to repeal the contradictory portions of the Public Health Code or to ensure the controlled, monitored distribution of marijuana to seriously ill individuals in accordance with the well-tested provisions of the

---

[7] A substance may be included in schedule 2 if the substance has a high potential for abuse and that abuse may lead to severe psychic or physical dependence, but the substance also has "currently accepted medical use in treatment in the United States, or currently accepted medical use with severe restrictions." MCL 333.7213. A substance may be included in Schedule 3 if the substance has a potential for abuse less than a schedule 1 or schedule 2 controlled substance and abuse of the substance may lead to moderate or low physical dependence or high psychological dependence, but the substance also has "currently accepted medical use in treatment in the United States." MCL 333.7215.

Public Health Code.[8] Instead, it creates a new system, untested in this state, in which a physician merely "certifies" that an individual would likely "benefit" from using marijuana to alleviate pain, nausea, or other symptoms, while leaving it to the patient to register under the act and to self-regulate the quality and quantity of marijuana the patient uses.

Accordingly, the confusing nature of the MMMA, and its susceptibility to multiple interpretations, creates an untoward risk for Michiganders.[9] Reading the statute carelessly or out of context could result in jail or prison time for many of our citizens. Until our Supreme Court and the Legislature clarify and define the scope of the MMMA, it is important to proceed cautiously when seeking to take advantage of the protections in it. Those citizens who proceed without due caution will become test cases and may lose both their property and their liberty.[10]

---

[8] Critics might argue that reclassifying marijuana under the Public Health Code would be ineffective because it would require doctors to ignore federal provisions banning them from prescribing marijuana. Yet it is important to remember that the entirety of the MMMA stands in conflict with federal law. Accordingly, such criticism would less likely stem from a desire to adhere to federal law than from a desire to steer the risk associated with breaking federal law away from those perceived as less willing to take that risk. The Catch-22 here is that doctors would not, and should not, put their medical licenses at risk.

[9] At the preliminary examination in this matter, the learned Judge Robert Turner, a veteran of many years on the bench, stated that the MMMA "is one of the worst pieces of legislation I have ever seen in my life." In interpreting this act, Judge Turner assumed that the sole purpose of it was to set forth the rules and regulations for the medical use of marijuana in Michigan, but it is becoming increasingly clear that the act is being used as a subterfuge to legalize marijuana in Michigan. It is well crafted in its obfuscations, ambiguous language, and confusingly overlapping sections.

[10] Until our Supreme Court provides a final comprehensive interpretation of this act, it would be prudent for the citizens of this state to avoid

### III. THROUGH THE MAZE

The MMMA consists of 10 sections detailing the protections, procedures, and defenses surrounding the medical use of marijuana in this state. However, much of the confusion caused by the MMMA arises from difficulty understanding the interplay among §§ 4, 7, and 8. Section 4 addresses the protections afforded to qualifying patients, caregivers, and others under the act:

> (a) A qualifying patient who has been issued and possesses a registry identification card shall not be subject to arrest, prosecution, or penalty in any manner, or denied any right or privilege, including but not limited to civil penalty or disciplinary action by a business or occupational or professional licensing board or bureau, for the medical use of marihuana in accordance with this act, provided that the qualifying patient possesses an amount of marihuana that does not exceed 2.5 ounces of usable marihuana, and, if the qualifying patient has not specified that a primary caregiver will be allowed under state law to cultivate marihuana for the qualifying patient, 12 marihuana plants kept in an enclosed, locked facility. Any incidental amount of seeds, stalks, and unusable roots shall also be allowed under state law and shall not be included in this amount.

> (b) A primary caregiver who has been issued and possesses a registry identification card shall not be subject to arrest, prosecution, or penalty in any manner, or denied any right or privilege, including but not limited to civil penalty or disciplinary action by a business or occupational or professional licensing board or bureau, for assisting a qualifying patient to whom he or she is connected through

all use of marijuana if they do not wish to risk violating state law. I again issue a stern warning to all: please do not attempt to interpret this act on your own. Reading this act is similar to participating in the Triwizard Tournament described in J.K. Rowling's *Harry Potter and the Goblet of Fire*: the maze that is this statute is so complex that the final result will only be known once the Supreme Court has had an opportunity to review and remove the haze from this act.

the department's registration process with the medical use of marihuana in accordance with this act, provided that the primary caregiver possesses an amount of marihuana that does not exceed:

(1) 2.5 ounces of usable marihuana for each qualifying patient to whom he or she is connected through the department's registration process; and

(2) for each registered qualifying patient who has specified that the primary caregiver will be allowed under state law to cultivate marihuana for the qualifying patient, 12 marihuana plants kept in an enclosed, locked facility; and

(3) any incidental amount of seeds, stalks, and unusable roots.

(c) A person shall not be denied custody or visitation of a minor for acting in accordance with this act, unless the person's behavior is such that it creates an unreasonable danger to the minor that can be clearly articulated and substantiated.

(d) There shall be a presumption that a qualifying patient or primary caregiver is engaged in the medical use of marihuana in accordance with this act if the qualifying patient or primary caregiver:

(1) is in possession of a registry identification card; and

(2) is in possession of an amount of marihuana that does not exceed the amount allowed under this act. The presumption may be rebutted by evidence that conduct related to marihuana was not for the purpose of alleviating the qualifying patient's debilitating medical condition or symptoms associated with the debilitating medical condition, in accordance with this act.

(e) A registered primary caregiver may receive compensation for costs associated with assisting a registered qualifying patient in the medical use of marihuana. Any such compensation shall not constitute the sale of controlled substances.

(f) A physician shall not be subject to arrest, prosecution, or penalty in any manner, or denied any right or privilege, including but not limited to civil penalty or

disciplinary action by the Michigan board of medicine, the Michigan board of osteopathic medicine and surgery, or any other business or occupational or professional licensing board or bureau, solely for providing written certifications, in the course of a bona fide physician-patient relationship and after the physician has completed a full assessment of the qualifying patient's medical history, or for otherwise stating that, in the physician's professional opinion, a patient is likely to receive therapeutic or palliative benefit from the medical use of marihuana to treat or alleviate the patient's serious or debilitating medical condition or symptoms associated with the serious or debilitating medical condition, provided that nothing shall prevent a professional licensing board from sanctioning a physician for failing to properly evaluate a patient's medical condition or otherwise violating the standard of care for evaluating medical conditions.

(g) A person shall not be subject to arrest, prosecution, or penalty in any manner, or denied any right or privilege, including but not limited to civil penalty or disciplinary action by a business or occupational or professional licensing board or bureau, for providing a registered qualifying patient or a registered primary caregiver with marihuana paraphernalia for purposes of a qualifying patient's medical use of marihuana.

(h) Any marihuana, marihuana paraphernalia, or licit property that is possessed, owned, or used in connection with the medical use of marihuana, as allowed under this act, or acts incidental to such use, shall not be seized or forfeited.

(i) A person shall not be subject to arrest, prosecution, or penalty in any manner, or denied any right or privilege, including but not limited to civil penalty or disciplinary action by a business or occupational or professional licensing board or bureau, solely for being in the presence or vicinity of the medical use of marihuana in accordance with this act, or for assisting a registered qualifying patient with using or administering marihuana.

(j) A registry identification card, or its equivalent, that is issued under the laws of another state, district, territory, commonwealth, or insular possession of the United States that allows the medical use of marihuana by a visiting qualifying patient, or to allow a person to assist with a visiting qualifying patient's medical use of marihuana, shall have the same force and effect as a registry identification card issued by the department.

(k) Any registered qualifying patient or registered primary caregiver who sells marihuana to someone who is not allowed to use marihuana for medical purposes under this act shall have his or her registry identification card revoked and is guilty of a felony punishable by imprisonment for not more than 2 years or a fine of not more than $2,000.00, or both, in addition to any other penalties for the distribution of marihuana. [MCL 333.26424.]

The unusual structure of this section reflects the intent of the MMMA as set forth in MCL 333.26422(b). Instead of describing an affirmative right to grow, possess, or use marijuana, § 4 simply indicates that registered qualifying patients, primary caregivers, and physicians are protected from arrest, prosecution, or penalty if they meet the specific requirements set forth.[11]

---

[11] Most legislation either grants rights and privileges to citizens by stating that a person may do a certain activity or it makes certain activity illegal. In either circumstance, the statute affirmatively indicates what an individual may or may not do. The MMMA does the opposite; instead of granting a right or implementing a prohibition, the statute leaves the underlying prohibition of the manufacture, possession, or use of marijuana intact and states that individuals meeting certain criteria "shall not be subject to arrest, prosecution, or penalty" for using, possessing, or growing marijuana under specified circumstances. As a result, this state finds itself in the unusual position of having a statute that precludes enforcement, in certain circumstances, of another statute that makes certain activity illegal. Needless to say, this decision to use one statute to undercut the enforceability of another statute, instead of simply redefining the circumstances under which marijuana use and possession are legal in this state, greatly adds to the confusion that surrounds this act.

A closer look at the pertinent subsections of § 4 further shows this to be the case. Section 4(a) specifies that a qualifying patient with a registry identification card is not subject to arrest, prosecution, or penalty "for the medical use of marihuana in accordance with this act . . . ." MCL 333.26424(a). MCL 333.26423(h) defines a "qualifying patient" as "a person who has been diagnosed by a physician as having a debilitating medical condition." Accordingly, even if a qualifying patient has a registry identification card, that patient is entitled to protection under the MMMA only if he or she has also been diagnosed with a debilitating medical condition. In order to "diagnose" a patient, a physician must "determine the identity of (a disease, illness, etc.) by a medical examination." *Random House Webster's College Dictionary* (2001). Accordingly, regardless of whether an individual has a registry identification card, that individual is not a "qualifying patient" under the MMMA and, therefore, is not entitled to the act's protections unless a physician has determined that the patient suffers from an identifiable debilitating condition.[12]

Under § 4(a), a qualifying patient may engage in the "medical use" of marijuana without fear of arrest. Interestingly, the term "medical use," as defined by the MMMA, is much broader than one would anticipate. MCL 333.26423(e) defines the term "medical use" as "the acquisition, possession, cultivation, manufacture, use, internal possession, delivery, transfer, or transpor-

---

[12] Thus, an individual is not entitled to protection under the MMMA if a physician has acknowledged only that the individual suffers from *symptoms* of a disease or illness (such as pain, nausea, or anxiety) but has not actually diagnosed that person as having a debilitating disease or illness. Also, the term "medical use" is only employed in specific sections of this act, while the term "use" is employed in other sections, thereby suggesting two separate meanings for the term "use" within the act.

tation of marihuana or paraphernalia relating to the administration of marihuana to treat or alleviate a registered qualifying patient's debilitating medical condition or symptoms associated with the debilitating medical condition." The definition of "medical use" is unexpectedly broad: although a qualifying patient may not sell marijuana, just about anything else an individual can do with marijuana would be considered *medical use* under the MMMA.[13]

Section 4(a) also provides that a qualifying patient is not subject to arrest, prosecution, or penalty for the medical use of marijuana if that patient has no more than 12 marijuana plants in an enclosed, locked facility. MCL 333.26424(a). Alternatively, the qualifying patient may designate a primary caregiver to grow up to 12

---

[13] An example of this conflict is § 4(a) and § 7(b)(2) of the act. Section 4(a) allows 18-year-old high school students to grow and use marijuana if they are properly registered with the state. MCL 333.26424(a). Section 4(a) also states that as long as he or she is a qualifying patient who has a registry card, the student "shall not be subject to arrest, prosecution, or penalty in any manner" whatsoever. *Id.* Reading § 4(a) in isolation allows 18-year-old students to possess marijuana in our schools without being subject to arrest, prosecution, or penalty in any manner whatsoever. Conflicting with § 4(a) is § 7(b)(2)(B), which provides that one may not possess marijuana on the grounds of any preschool or primary or secondary school. MCL 333.26427(b)(2)(B).

Sections 4(b) and 7(b)(5) are also in conflict. Section 7(b)(5) states that a person may not use marijuana if that person does not have a serious or debilitating medical condition. MCL 333.26427(b)(5). Section 4(b) allows primary caregivers to assist qualifying patients. MCL 333.26424(b). Nothing in § 4(a) or (b) allows primary caregivers to use marijuana, unless they qualify under § 4(a). The conflict arises because the act allows primary caregivers to grow marijuana, but it prohibits those who are not "qualifying patients" to use marijuana. I note that caregivers receive registration cards under the statute but are not required to have a "written certification" stating they have a debilitating condition. The only logical conclusion is that "primary caregivers" who do not possess a "qualifying patient" registry card are not permitted to use marijuana under the MMMA.

plants in an enclosed, locked facility. However, because the statute provides that a qualified patient may be in possession of the specified number of marijuana plants only if the patient has not designated a primary caregiver to grow marijuana for him or her, if the qualified patient has made such a designation, the statute provides that qualified patient no protection from arrest if found in the possession of any marijuana plants.

Section 4(b) specifies the circumstances in which a registered primary caregiver is protected from arrest. MCL 333.26424(b). MCL 333.26423(g) defines a "primary caregiver" as "a person who is at least 21 years old and who has agreed to assist with a patient's medical use of marihuana and who has never been convicted of a felony involving illegal drugs." Section 4(b) specifies that a registered primary caregiver may assist *only* a qualifying patient[14] *to whom he or she is connected through the registration process* with the medical use of marijuana. Accordingly, a primary caregiver may not assist *any* qualifying patient in the acquisition, possession, cultivation, manufacture, use, internal possession, delivery, transfer, or transportation of marijuana unless *that* caregiver is connected to *that* qualifying patient

---

[14] The act uses both the terms "qualifying patient" and "patient." While qualifying patients enjoy greater protections under § 4 than patients do under § 8, both qualifying patients and patients must follow all the provisions of the act, including the requirement that all patients growing marijuana do so in an enclosed, locked facility. Growing marijuana in the backyard thus subjects the grower and the homeowner to the penalties found in the Public Health Code. This requirement is consistent with the language of the ballot proposal. Whether each patient's 12 marijuana plants must be grown in a separate locked facility is an issue best left for another day. Those caregivers who commingle various patients' plants in one facility may look forward to becoming test cases. Primary caregivers may have only five patients and, if the qualifying patient designates him- or herself as his or her own caregiver, then that caregiver is allowed only four additional patients. MCL 333.26426(d).

through registration with the Department of Community Health (DCH). Section 6(d) specifies that "each qualifying patient can have no more than 1 primary caregiver, and a primary caregiver may assist no more than 5 qualifying patients with their medical use of marihuana." MCL 333.26426(d). Accordingly, no primary caregiver who wishes to benefit from the protections offered by the MMMA may assist more than five qualifying patients in acquiring, possessing, cultivating, manufacturing, using, internally possessing, delivering, transferring, or transporting marijuana, presuming that the five qualifying patients in question are connected to that caregiver through the department's registration process.[15] Any assistance that any primary caregiver provides on behalf of any qualifying patient to whom that caregiver is *not* connected by the registration process is not subject to the protections of the MMMA.

Similarly, a primary caregiver may not possess more than "12 marihuana plants kept in an enclosed, locked facility" for each qualifying patient to whom the caregiver is connected through the registration process and who has that patient's permission to cultivate the allotment of marijuana plants. MCL 333.26424(b)(2). MCL 333.26423(c) defines an "enclosed, locked facility"

---

[15] Many Michiganders are faced with the often unwelcome intrusion of medical-marijuana dispensaries in their communities, and local governments are faced with the difficult task of determining whether they are obliged to allow such dispensaries to operate in their communities. Yet, interestingly, under a proper reading of § 4(b), the operation of a dispensary would make little economic sense, because in order to abide by the provisions of the MMMA, the dispensary would have to be operated entirely by one individual, and could have, at most, five customers. This is because, first, the MMMA has no provision for the sale of marijuana and, second, a primary caregiver is permitted to receive compensation only for the costs associated with assisting a qualifying patient to whom he or she is connected through registration with the DCH.

as "a closet, room, or other enclosed area equipped with
locks or other security devices that permit access only
by a registered primary caregiver or registered qualify-
ing patient." Although it is unclear from the statute
whether each grouping of 12 plants must be in a
separate enclosed, locked facility,[16] it *is* clear that under
no circumstances may a primary caregiver be in posses-
sion of more than a total of 60 marijuana plants,
presuming that the primary caregiver acts in that
capacity for the statutory maximum of five qualifying
patients, all of whom have given the caregiver the
authority to cultivate marijuana for them. Because a
qualified patient who has designated a primary car-
egiver to cultivate marijuana for him or her may not
him- or herself have possession of any marijuana plants,
the primary caregiver is the only individual permitted
to be in possession of the qualifying patient's marijuana
plants under this circumstance. Accordingly, this means
that each set of 12 plants permitted under the MMMA
to address the purported medical needs of a particular
qualifying patient must be kept in an enclosed, locked
facility that can only be accessed by one individual,
either the qualifying patient or the qualifying patient's
primary caregiver; any other individual with access to
the marijuana plants designated for a particular quali-

---

[16] Anyone growing more than 12 plants in one separate enclosed,
locked facility should not complain or be surprised when or if a federal
drug enforcement agent appears. Again, under federal law, cultivating
marijuana is illegal. Growing large quantities of marijuana in an
enclosed, locked facility is the same as waving a red flag in front of a
3,000-pound bull. Any questions in this regard are quickly answered
by reading the Gus Burns article in the April 22, 2010, *Saginaw News,
Federal agents and sheriff's deputies say seized marijuana in Saginaw
County was illegal and not medicine.* <http://www.mlive.com/
news/saginaw/index.ssf/2010/04/federal_agents_and_sheriffs_de.html>
(accessed September 13, 2010). Caregivers who do not want to become a test
case should proceed with caution. No clear, reliable, or lasting resolution to
this conflict between state and federal law seems in view.

fying patient would be considered in possession of
marijuana and subject to arrest and prosecution for
violating the Public Health Code.[17]

---

[17] It is important to remember that under the laws of this state, "[a]
person need not have actual physical possession of a controlled
substance to be guilty of possessing it. Possession may be either actual
or constructive." *People v Wolfe*, 440 Mich 508, 519-520; 489 NW2d 748
(1992). "Constructive possession exists when the totality of the
circumstances indicates a sufficient nexus between the defendant and
the controlled substance." *People v Meshell*, 265 Mich App 616, 622;
696 NW2d 754 (2005). The "essential" element is that a defendant has
"dominion or right of control over the drug with knowledge of its
presence and character." *People v McKinney*, 258 Mich App 157, 165;
670 NW2d 254 (2003) (quotation marks and citation omitted). "Be-
cause it is difficult to prove an actor's state of mind, only minimal
circumstantial evidence . . . and the reasonable inferences that arise
from the evidence" are required to prove that a defendant had
constructive possession. *People v Brown*, 279 Mich App 116, 136-137;
755 NW2d 664 (2008). Accordingly, an individual who places himself in
the proximity of marijuana is at risk of being charged with possession
of the substance.

   In light of these rules concerning what constitutes possession, the
MMMA places the entire burden of cultivating a particular qualifying
patient's marijuana plants on one individual (either the qualifying
patient or his or her primary caregiver). No other individual can legally
even water the plants or enter the enclosed, locked facility to turn on a
grow light without risking arrest and prosecution for violating the Public
Health Code. This means that primary caregivers and qualifying patients
cannot legally form a cooperative and grow marijuana in a shared facility
without violating the MMMA and thus being subject to arrest and
prosecution under the Public Health Code.

   Presumably the drafters affiliated with the Marijuana Policy
Project agree. Diane Byrum, a spokesperson for the proposal indicated
that "[t]he Michigan proposal wouldn't permit the type of cooperative
growing that allows pot shops to exist in California. Those kinds of
operations are what have faced federal crackdowns." Satyanarayana,
*Is Marijuana Good Medicine?* Detroit Free Press, October 25, 2008,
available at <http://www.freep.com/article/20081025/NEWS15/
810250341/Is-marijuana-good-medicine> (accessed September 10,
2010). Accordingly, before the November 2008 vote on this ballot
proposal, even the drafters of the MMMA were unequivocal that the
statute would not permit marijuana growing cooperatives in Michigan.

Section 4(e) permits a registered primary caregiver to receive compensation for the costs associated with assisting a registered qualifying patient in the medical use of marijuana. MCL 333.26424(e). However, under § 4(b), a registered primary caregiver may assist only a registered qualifying patient to whom he or she is connected through registration with the DCH. MCL 333.26424(b). Accordingly, §§ 4(b) and 4(e) can only be reconciled by concluding that the primary caregiver's "compensation for costs associated with assisting a registered qualifying patient in the medical use of marihuana" will come from only a registered qualifying patient to whom he or she is connected through the department's registration process.[18] MCL 333.26424(e). Because a primary caregiver may assist only the five or fewer qualifying patients to whom the caregiver is connected through the registration process, there is no circumstance under the MMMA in which the primary caregiver can provide assistance to any *other* qualifying patient, and receive compensation in exchange, without being subject to arrest and prosecution under the Public Health Code.[19]

---

[18] Stated another way, only the person the qualifying patient names as his or her primary caregiver on the registration form can receive compensation for associated costs, and that compensation can only be received from the "qualifying patient to whom he or she is connected through the department's registration process . . . ." MCL 333.26424(b).

[19] A familiar example may help clarify how the provisions of the MMMA are connected to each other. Michigan has statutory qualifications for persons entering into a state of matrimony. See MCL 551.1 (restricting marriage to couples of opposite gender); MCL 551.3 (disqualifying couples who are of specified, close degrees of familial affinity). There is also a registration requirement in the form of a marriage license. MCL 551.2. Married couples have many statutory rights and duties. See, e.g., MCL 205.93(3)(a) (the right to transfer property and free from use tax); MCL 600.2162 (the right to not testify against a spouse); MCL 552.7 (authorizing actions for separate maintenance). The registration, or licensing, requirement inheres in all statutory references to marriage,

In addition, a primary caregiver may receive compensation for only the *costs* associated with assisting a registered qualifying patient in the medical use of marijuana. *Id.* This simply means that the primary caregiver may receive reimbursement for monetary expenses incurred in the course of assisting the qualifying patient in the medical use of marijuana. The statute does not authorize compensation for the labor involved in cultivating marijuana or for otherwise assisting the qualifying patient in its use, nor does it indicate that the primary caregiver may profit financially from this role.

Section 4(f) protects a physician from arrest for providing written certifications *if* the certifications were provided in the course of a bona fide physician-patient relationship *and* if the physician first completed a full assessment of the qualifying patient's medical history. MCL 333.26424(f). Unfortunately, the statute does not indicate how the existence of an authentic physician-patient relationship can be discerned. However, a fact-finder might wish to ask certain questions when determining whether the physician-patient relationship was authentic, including (a) whether the physician signing the written certification form was the patient's primary caregiver, (b) whether the patient had an established history of receiving medical care from that physician, (c) whether the physician diagnosed a

and thus there is no need to repeat it with each statutory mention. For example, MCL 206.311(3) authorizes the filing of joint tax returns by "husband and wife," but does not reiterate that this concerns couples licensed to marry each other. To conclude that any married person, qualified and registered under the laws of this state, may file jointly with any other married person, so qualified and registered, would be nonsensical and lead to an absurd result. As the statutory registration, or licensing, requirement carries through all marriage law, so should the registration requirement of the MMMA be understood as carrying through all provisions of that act.

particular debilitating medical condition instead of simply stating that a patient's reported symptoms must be the result of some such unidentified condition, (d) whether the physician was paid specifically to sign the written certification, and (e) whether the physician has a history of signing an unusually large number of certifications. Needless to say, those doctors hired specifically to sign certification forms are suspect and deserve special scrutiny by prosecutors, the DCH, and the legislative oversight committees of both the House and Senate.[20]

Section 4(f) also indicates that

> [a] physician shall not be subject to arrest . . . for otherwise stating that, in the physician's professional opinion, a patient is likely to receive therapeutic or palliative benefit from the medical use of marihuana to treat or alleviate the patient's serious or debilitating medical condition or symptoms associated with the serious or debilitating medical condition . . . ." [MCL 333.26424(f)]

This provision does not create an alternative scenario under which a physician may issue a written certification to a patient in the absence of a bona fide physician-patient relationship with that patient or a full assessment of the patient's medical history. Instead, this provision merely provides a physician with additional protection from legal penalties, or disciplinary action by

---

[20] The DCH should keep track of the number of certification forms each doctor signs. If it is determined that certain doctors are collecting money for routinely signing the forms, those doctors should be disqualified from participation in the Michigan medical marihuana program. It is beyond question that one doctor treating 100, 500, or 1,000 terminally ill patients in the course of 10-minute examinations has *not* been acting pursuant to bona fide physician-patient relationships. A revolving-door, rubber-stamp, assembly-line certification process does not constitute activity "in the course of a bona fide physician-patient relationship," especially when the doctor fails to set any medical boundaries for his or her patients and fails to monitor the patient's progress on a regular basis.

a professional licensing board if the physician opines in general that an individual might benefit from the medical use of marijuana.

Section 4(i) provides that "[a] person shall not be subject to arrest . . . solely for being in the presence or vicinity of the medical use of marihuana in accordance with this act, or for assisting a registered qualifying patient with using or administering marihuana." MCL 333.26424(i). In a possible attempt at chicanery, the drafters of the act thus slipped into this subsection the term *"person,"* instead of discussing the protections and responsibilities of a "caregiver" or "qualifying patient." Reading § 4(i) in isolation could cause one to conclude that it constitutes a nullification of all provisions in the Public Health Code that punish individuals who come in contact with marijuana. However, when reading § 4(i) in context, it is clear that it is not, and is not intended to function as, a permission slip to manufacture or sell marijuana in Michigan. First, because the MMMA does not grant *rights* to anyone, the use of the word "person" instead of the more specific terms "qualifying patient" and "primary caregiver" does not constitute an expansion of any rights. Instead, although a "person" may not be subject to arrest under § 4(i) for "assisting a registered qualifying patient with using or administering marihuana," it is clear that this protection does not extend to assisting a registered qualifying patient in the *medical use* of marijuana as defined by MCL 333.26423(e). Instead, this protection from arrest only extends to providing assistance in "using or administering" marijuana, which is much more limited. Such assistance would be in the nature of holding or rolling a marijuana cigarette, filling a pipe, or preparing marijuana-laced brownies for the qualifying patient suffering from a terminal

illness or a debilitating condition. Section 4(i) does
not protect persons generally from arrest for acquir-
ing, possessing, cultivating, manufacturing, deliver-
ing, transferring, or transporting marijuana on be-
half of the qualifying patient.

Finally, § 4(k) imposes a penalty on those registered
qualifying patients or registered primary caregivers
who sell marijuana to "someone who is not allowed to
use marihuana for medical purposes under this
act . . . ." MCL 333.26424(k). The penalty is severe: a
violator faces up to two years in prison or a fine of up to
$2,000, or both. However, that this subsection specifies
a particular punishment for a specific type of violation
does not mean that, by default, the sale of marijuana to
someone who *is* allowed to use marijuana for medical
purposes under this act is permitted. The MMMA does
*not* give any individual permission to sell marijuana in
the state of Michigan for any purpose. Instead, the
MMMA merely identifies circumstances under which
qualifying patients and primary caregivers are pro-
tected from arrest and prosecution for the "medical
use" of marijuana. If the drafters of this statute had
wanted to legalize the sale of marijuana to qualifying
patients from primary caregivers or other qualifying
patients, they would have included the term "sale" in
the definition of "medical use." MCL 333.26423(e).
They did not and, therefore, the sale of marijuana is not
a permitted activity under § 4.[21] Stated differently, the

_____

[21] As explained earlier, § 4(e) permits a primary caregiver to receive
compensation for the *costs* associated with assisting a registered qualify-
ing patient to whom he or she is connected through the DCH's registra-
tion process. Again, this means that the primary caregiver may receive
reimbursement for monies paid in the course of assisting the qualifying
patient in the medical use of marijuana, but may not receive compensa-
tion or otherwise profit from the labor involved in cultivating marijuana
or otherwise assisting the qualifying patient in its medical use.

MMMA does not legalize the sale of marijuana to any individual, even one registered as a qualifying patient.[22]

Section 7 of the act is very specific about use of marijuana for medical purposes. It provides as follows:

(a) The medical use of marihuana is allowed under state law to the extent that it is carried out in accordance with the provisions of this act.

(b) This act shall not permit any person to do any of the following:

(1) Undertake any task under the influence of marihuana, when doing so would constitute negligence or professional malpractice.

(2) Possess marihuana, or otherwise engage in the medical use of marihuana:

(A) in a school bus;

(B) on the grounds of any preschool or primary or secondary school; or

(C) in any correctional facility.

(3) Smoke marihuana:

(A) on any form of public transportation; or

(B) in any public place.

(4) Operate, navigate, or be in actual physical control of any motor vehicle, aircraft, or motorboat while under the influence of marihuana.

(5) Use marihuana if that person does not have a serious or debilitating medical condition.

(c) Nothing in this act shall be construed to require:

(1) A government medical assistance program or commercial or non-profit health insurer to reimburse a person for costs associated with the medical use of marihuana.

---

[22] Accordingly, I can find no circumstance under which the MMMA *legalizes* the sale of marijuana by medical-marijuana dispensaries. The statute simply does not permit that activity.

(2) An employer to accommodate the ingestion of marihuana in any workplace or any employee working while under the influence of marihuana.

(d) Fraudulent representation to a law enforcement official of any fact or circumstance relating to the medical use of marihuana to avoid arrest or prosecution shall be punishable by a fine of $500.00, which shall be in addition to any other penalties that may apply for making a false statement or for the use of marihuana other than use undertaken pursuant to this act.

(e) All other acts and parts of acts inconsistent with this act do not apply to the medical use of marihuana as provided for by this act. [MCL 333.26427.]

When interpreting § 7, it is important to remember that an individual acquires protection from arrest and prosecution under this act only if suffering from serious or debilitating medical condition. A person without such a condition, as defined by the act and diagnosed by a physician, is prohibited from using marijuana and remains subject to the penalties set forth in the Public Health Code. Section 7(b)(5) acts as an affirmative defense to a prosecution under the Public Health Code, meaning that the defendant has the responsibility of establishing that he or she was suffering from a serious or debilitating medical condition as a prerequisite to establishing a medical-marijuana defense. Once the defendant has presented sufficient evidence to establish the existence of a sufficiently serious medical condition, the prosecution may seek to rebut it, including by cross-examination of the defendant's physician regarding whether the defendant had a serious or debilitating medical condition. Of course, the prosecution may also call medical expert witnesses to rebut the defendant's evidence.

A defendant asserting the medical-marijuana defense bears the burden of establishing the existence of a

qualifying medical condition; a mere assertion is not sufficient.[23] Further, it logically follows that a defendant resorting to that defense by placing into evidence his or her medical condition necessarily waives any physician-patient privilege that would otherwise limit a prosecutor's prerogative to question the defendant's physician or examine pertinent medical records.

In the present case, both defendants contend that they are entitled to assert an affirmative defense under § 8 of the MMMA. Section 8 addresses affirmative defenses for patients and caregivers under the act. It reads as follows:

> (a) Except as provided in section 7, a patient and a patient's primary caregiver, if any, may assert the medical purpose for using marihuana as a defense to any prosecution involving marihuana, and this defense shall be presumed valid where the evidence shows that:

> (1) A physician has stated that, in the physician's professional opinion, after having completed a full assessment of the patient's medical history and current medical condition made in the course of a bona fide physician-patient relationship, the patient is likely to receive therapeutic or palliative benefit from the medical use of marihuana to treat or alleviate the patient's serious or debilitating medical condition or symptoms of the patient's serious or debilitating medical condition;

---

[23] Although most qualifying patients and primary caregivers apparently believe that they are immune from arrest or prosecution if they possess registry identification cards, the MMMA makes no such provision. Instead, the act leaves a qualifying patient or primary caregiver subject to criminal proceedings for any conduct not for the purposes of alleviating the qualifying patient's debilitating medical condition or its symptoms. MCL 333.26424(a) and (b); MCL 333.26427(b)(5). In my opinion, all certification forms should include a warning that, even though the patient has a registry identification card, the patient could still be prosecuted for conduct that is not in strict accordance with the provisions of the MMMA.

(2) The patient and the patient's primary caregiver, if any, were collectively in possession of a quantity of marihuana that was not more than was reasonably necessary to ensure the uninterrupted availability of marihuana for the purpose of treating or alleviating the patient's serious or debilitating medical condition or symptoms of the patient's serious or debilitating medical condition; and

(3) The patient and the patient's primary caregiver, if any, were engaged in the acquisition, possession, cultivation, manufacture, use, delivery, transfer, or transportation of marihuana or paraphernalia relating to the use of marihuana to treat or alleviate the patient's serious or debilitating medical condition or symptoms of the patient's serious or debilitating medical condition.

(b) A person may assert the medical purpose for using marihuana in a motion to dismiss, and the charges shall be dismissed following an evidentiary hearing where the person shows the elements listed in subsection (a).

(c) If a patient or a patient's primary caregiver demonstrates the patient's medical purpose for using marihuana pursuant to this section, the patient and the patient's primary caregiver shall not be subject to the following for the patient's medical use of marihuana:

(1) disciplinary action by a business or occupational or professional licensing board or bureau; or

(2) forfeiture of any interest in or right to property. [MCL 333.26428.]

In this section, the act speaks for the first time in terms of a patient instead of a qualifying patient. The purpose of § 8 is to establish an affirmative defense for those marijuana users and growers who are not registered with the state. Read out of context and with a limitless imagination, one could conclude that qualifying patients, patient caregivers, physicians, or persons in general may not be arrested or prosecuted for any actions involving marijuana, i.e., the act in essence legalizes marijuana in Michigan. But, as I have previ-

ously stated, the language of the ballot proposal and a contextual reading of the act belie this premise.

In order for defendants to assert an affirmative defense under § 8(a)(1), they must first establish that Dr. Eric Eisenbud, the physician who signed their medical-marijuana authorizations, treated them *in the course of a bona fide physician-patient relationship*, and they must further establish under § 7(b)(5) that they have a *serious or debilitating condition*. Both defendants have failed to establish either prerequisite to asserting a § 8 affirmative defense.

At issue is the phrase, "in the course of a bona fide physician-patient relationship." This phrase has three components: *physician-patient relationship*, *bona fide*, and *in the course of*. When construing a statute, a court should presume that every word has some meaning; a construction rendering some part nugatory or surplusage should be avoided. *People v Seiders*, 262 Mich App 702, 705; 686 NW2d 821 (2004). "Physician-patient relationship" clearly means that a patient must have the traditional doctor-patient relationship. Use of the qualifier "bona fide" indicates that the drafters of this act were concerned about such doctors as the one in Livingston County described in part IV of this opinion who routinely sell written certifications for profit, rather than provide them for any genuine medical reason. Any such doctor is not engaging in the good-faith practice of medicine, and any such certifications must be disallowed under this act.[24] "In the course of"

---

[24] Some seek marijuana for treatment of depression and anxiety disorders. At the very least, the progress of such treatments should be carefully monitored by a doctor. But the MMMA appears to discard the concept of any monitoring within the "bona fide" physician-patient relationship. If monitoring of patients is not taking place, how can the physician-patient relationship be a bona fide one? Should the medical profession step forward on this issue? I note that the medical profession generally opposed the

clearly means that the bona fide relationship has been in existence beyond just one occasion. An individual who visits a doctor for the first time for the sole purpose of obtaining certification for the medical use of marijuana, especially after an arrest on drug charges, does not satisfy the requirement that the certification come about *in the course of a bona fide physician-patient relationship*. Conversely, a primary-care physician who has long been treating a patient suffering from a terminal illness or a serious or debilitating condition is certainly acting *in the course of a bona fide physician-patient relationship*.

Certain protocols must be adhered to, or elements met, before a bona fide physician-patient relationship can be established. Among these are the following: the physician must create and maintain medical records; the physician must have a complete understanding of the patient's medical history; specific medical issues must be identified and plans developed to address each; treatment must be conducted in a professional setting; the physician must, when appropriate, set boundaries for the patient; and the physician must monitor the patient's progress. Important for the treatment of most medical conditions, especially those involving chronic pain, is continuity of treatment. Some chronic-pain patients with serious or debilitating conditions need constant monitoring for their own safety. I note that, in the present case, while some of these protocols or elements were present in Dr. Eisenbud's treatment of defendants, others were lacking in both substance and process.

In order to have a bona fide physician-patient relationship, a legal duty must be established between the physi-

---

MMMA because, as one official put it, " 'it's not in the public health interest to see people smoke.' " Satyanarayana, n 17 *supra*, quoting Donald Allen, director of the Office of Drug Control and Policy.

cian and his or her patient. If no duty arises from the relationship, then no legally recognizable physician-patient relationship exists. Only once a physician-patient relationship is established and a treatment plan is instituted may a physician be held liable for malpractice under Michigan law. However, by insulating a physician from "prosecution, or penalty in any manner," including "civil penalty" in connection with that physician's certification of a patient for the medical use of marijuana, § 4(f) leaves a physician so acting unaccountable in the matter to society and to his or her patient. MCL 333.26424(f). It is problematic to classify as bona fide a physician-patient relationship when the physician has no enforceable duties to the patient. In my opinion, because physicians such as Dr. Eisenbud, in the course of approving written certifications for the medical use of marijuana, do not establish a legally binding physician-patient relationship in the matter, such relationships, in the eyes of the law, are not bona fide.

In this regard, the Catch-22 for patients is found in §§ 4(f) and 8(a). Section 4(f) provides that "a physician shall not be subject to arrest, prosecution, or penalty in any manner, or denied any right or privilege, including but not limited to civil penalty . . . ." MCL 333.26424(f). But § 8(a) of the act states that a patient can assert a medical-marijuana defense if *in the course of a bona fide physician-patient relationship* the physician makes certain statements and authorizes the patient to use marijuana. MCL 333.26428(a). It would be unusual, if not outright peculiar, for the law to recognize a physician-patient relationship if no potential liability attached to the actions of the treating physician. Because one part of the MMMA provides that no civil liability, and thus no potential malpractice liability, attaches to physicians who authorize the medical use of marijuana, while another part of the act states that a

physician must have a bona fide physician-patient relationship to assert the affirmative medical-marijuana defense, the act presents a seemingly irreconcilable internal conflict.

Adding to the confusion in this case is that, according to the record, *all* of Dr. Eisenbud's patients visited him for a single treatment plan and for no other purpose. In each instance then, the patient is not only directing the treatment plan, but setting his or her own boundaries and monitoring his or her own progress. It strains credibility to suggest that a treatment plan has already been established before the doctor has examined the patient. The confusion is resolved by simply concluding that a one-stop shopping event to obtain a permission slip to use marijuana under § 8 does not meet the requirement of § 8(a)(1) that the authorization occur in the course of a bona fide physician-patient relationship. Stated another way, a § 8 affirmative defense is not available unless the testifying physician is the patient's treating physician for the underlying serious or debilitating condition. Dr. Eisenbud was not either defendant's treating physician, and therefore the § 8 affirmative defense was not available to them.

In an attempt to explain and help this Court interpret the protections contained in the MMMA, Karen O'Keefe, who was identified in part II of this opinion as director of state policies at the MPP in Washington, D.C., filed an affidavit in this case. In the affidavit, Ms. O'Keefe stated, in paragraph 4, that she was the "principal drafter of Michigan's medical marijuana ballot initiative." In paragraph 7 she stated, "We intended for both Michigan law and MPP's model legislation to include two levels of protection," i.e., defenses, with § 4 providing the greater level of protection and § 8 a lesser level of protection. While that affidavit might assist this Court in separating

those two types of protection, it does not address any protections under either § 4 or § 8 concerning the sale of marijuana in Michigan. What it does accomplish is to confirm that the MMMA was intended to provide defenses from arrest and prosecution for the use of small amounts of marijuana for medical purposes. But neither the affidavit nor the act itself asserts that the MMMA provides any protections for the sale of marijuana in Michigan. To have authorized the sale of marijuana in Michigan, the MMMA would have had to specifically make such provision. It did not. I further note that the language of the ballot proposal did not mention that the sale of marijuana was included in the act. It is therefore clear that neither § 4 nor § 8 of the MMMA affords any protections for the sale of marijuana in Michigan.[25]

IV. WHAT MUST BE INCLUDED IN THE WRITTEN CERTIFICATION AND HOW DOES ONE OBTAIN A WRITTEN CERTIFICATION FROM A QUALIFIED PHYSICIAN?

Through no fault on the part of legitimate patients and caregivers who are taking pains in good faith to

---

[25] The MMMA contains a number of Catch-22 situations for the unsuspecting. The act allows someone who is properly registered to possess marijuana, but anyone receiving compensation for the marijuana from someone other than the registrant's primary caregiver may be prosecuted. The act also allows caregivers and patients to grow marijuana, but then provides that this must be done in an enclosed, locked facility. Anyone growing marijuana in his or her backyard can thus be prosecuted under the Public Health Code. Another peculiarity is that patients or their caregivers may grow marijuana, but there is no provision for the legal purchase of marijuana seeds or plants in the first instance. The act also includes no caregiver-reporting requirement, which raises the questions, How much may a caregiver charge his or her qualifying patient and how does a caregiver report the income on tax returns? Another oddity is that the act allows a patient or primary caregiver to possess 2.5 ounces of marijuana and 12 plants. MCL 333.26424(a) and (b). What is the legal consequence if the plants are all harvested at the same time and they happen to produce more than 2.5 ounces?

comply with the law and conduct themselves accordingly, the current written certification process reflects badly on them. The process also reflects badly on legitimate physicians who honestly believe that marijuana would assist their patients.

Section 3(*l*) of the MMMA defines "written certification" as

a document signed by a physician, stating the patient's debilitating medical condition and stating that, in the physician's professional opinion, the patient is likely to receive therapeutic or palliative benefit from the medical use of marihuana to treat or alleviate the patient's debilitating medical condition or symptoms associated with the debilitating medical condition. [MCL 333.26424(*l*).]

In the present case, defendants' written certification forms fail to set forth their respective debilitating medical conditions and therefore are invalid on their faces. I further regard the process used to obtain the written certification under the current administrative rules as suspect and opine that § 3(*l*) is clearly the most abused section in the MMMA.[26]

I do not direct my critical comments toward those qualifying patients who do in fact have a serious debilitating condition and seek some therapeutic or palliative solace in marijuana. This act was intended to help those individuals. My comments are directed at those who are currently abusing the written certification process, i.e., the majority of the persons who are becoming certified at this time. My comments are also directed at those who are charged with the oversight of the administrative process.

At oral argument, it was revealed that a certain Livingston County doctor was selling written certifica-

---

[26] I reiterate that, even with a registry identification card, a qualifying patient can be prosecuted for uses of marijuana exceeding the scope of the statutory defenses. See MCL 333.26424(d)(2).

tions for $50. Apparently all one had to do to obtain a
written certification to use marijuana was to show up at
this doctor's house and slip $50 under the door. This
history of the written certification process may in fact
jeopardize the entire medical-marijuana process for
those who are legitimately entitled to use it. New
checks and balances on this process are certainly nec-
essary to resolve this problem.[27]

I will set forth the histories of the MMMA and its
written certification process in parts V and VI of this
opinion and leave readers to form their own opinions
whether the written certification process is serving its
legitimate purpose or is being abused. It is within the
province of our legislative and executive officials to
retain or change that process. But I reiterate that in the
present case both defendants' written certifications[28]
did not comply with the statute and were therefore
invalid *ab initio*.[29] The balance of this opinion will

[27] There currently exist no checks and balances on physicians signing
the written certification forms. A simple revision of the form that
requires a doctor under penalty of perjury to attest that each patient has
a serious or debilitating condition and name that condition might clean
up the process. Doctors who are indiscriminately selling written certifi-
cations could then be penalized by the courts for issuing false certificates.
This would work an important reform, given that § 4(f) appears to
immunize even physicians who intentionally sign false certifications.
Limiting the number of certifications one doctor may sign might further
deter fraudulent certifications.

[28] In the present case, Dr. Eisenbud testified that he met with each
defendant for about a half-hour, spending 5 minutes reviewing the
medical records and about 10 minutes on the physical examination, while
also interviewing them. On those bases, Dr. Eisenbud then certified that
he was treating both defendants "for a terminal illness or a debilitating
condition." Such foolishness is so obvious on its face as to deserve no
more than a footnote in this opinion to expose it, although I note that
even Dr. Eisenbud's certifications appear to be more credible than the
Livingston County doctor described in the previous paragraph.

[29] The certification forms at issue here stated:

address issues concerning the written certification process, which the Legislature or the DCH are free to change if persuaded that a problem exists.

### V. THE HISTORY OF THE MMMA

The MMMA has a noble purpose, i.e., providing an avenue for improving the health or comfort of those afflicted with a serious or debilitating medical condition.[30] One supposes that most citizens voting for the MMMA envisioned that those individuals suffering

I, Eric Eisenbud, MD, am a physician, duly licensed in the State of Michigan. I have completed a full assessment of this patient's medical history, and I am treating this patient for a terminal illness or a debilitating condition as defined in Michigan's medical marijuana law. I completed a full assessment of this patient's current medical condition. This assessment was made in the course of a bona fide physician-patient relationship. I have advised the patient about the potential risks and benefits of the medical use of marijuana. I have formed my professional opinion that the potential benefits of the medical use of marijuana would likely outweigh any health risks for the patient. This patient is LIKELY to receive therapeutic or palliative benefit from the medical use of marijuana to treat or alleviate a serious or debilitating medical condition or symptoms of the serious or debilitating medical condition.

I note that Dr. Eisenbud attempted to specify neither what the ailment was, nor whether it constituted a terminal illness or a debilitating condition.

[30] Some assert that marijuana is not a bad thing, especially in light of current research, and that those thinking otherwise are illogical prudes. Then there is the view of the National Institute on Drug Abuse, which maintains that marijuana smoke contains 50 to 70 percent more carcinogenic hydrocarbons than tobacco smoke. *NIDA InfoFacts: Marijuana* <http://www.nida.nih.gov/infofacts/marijuana.html> (accessed September 10, 2010). The Partnership for a Drug Free America similarly reports that "[s]tudies show that someone who smokes five joints per week may be taking in as many cancer-causing chemicals as someone who smokes a full pack of cigarettes every day." *Drug Guide* <http://www.drugfree.org/portal/drug_guide/marijuana> (accessed September 10, 2010). While each of these views is legitimate, for the purposes of this opinion I am not concerned with which view the law should reflect. This

from such conditions would visit their regular doctors, obtain prescriptions for marijuana, and then have the prescription filled at a licensed pharmacy. Citizens would rightly expect such a process because the drug-delivery system in Michigan has always dispensed drugs in this manner.[31]

The DCH is the agency charged with regulating this new industry. Under the act, the DCH was required to draft within 120 days administrative rules to implement the act. MCL 333.26425(a). The Governor oversees administrative agencies such as the DCH, and the Legislature also plays a role, maintaining checks and balances to ensure that administrative agencies function properly. Under the normal process, those elected or appointed officials would maintain sufficient control of the process to assure that a schedule 1 drug would not be sold, distributed, or otherwise transferred to the public without a legitimate process in place to regulate the use, sale, and delivery of that drug.

Further, in legitimate medical practice, doctors would observe their ethical duties to sign their names to written certification forms only if their patients were actually suffering from terminal illnesses or serious or debilitating medical conditions, as the act specifies.[32] No ethical doctor would advertise for sale to

---

Court's job is to interpret statutes as they are written. Public policy is determined by the other branches of government.

[31] A question that arises is, Why is there the need for a specialized medical-marijuana business, instead of dispensing through pharmacies as is the case of other legal prescription drugs, if the marijuana is for medical purposes? The answer, in many cases, is that the medical purpose is mere pretext.

[32] In proper medical practice, when a doctor prescribes a drug, that doctor carefully monitors the patient to see if the drug is working, if there are side effects, etc. Shouldn't doctors similarly monitor their

unqualified patients his or her signature on those
forms. Doctors with the personal integrity demanded
of that profession would not examine a patient for
just several minutes, opine from that short examina-
tion that the patient has a terminal illness or a
serious or debilitating condition, and then certify
that the patient would benefit from the use of a
schedule 1 drug. Or would they? Given that these
practices have become widespread in Michigan, either
I, or the doctors engaging in that practice, should
review the question of what integrity and ethics in
the medical profession entail.

The ballot proposal was not intended to legalize
marijuana in the state of Michigan. It was intended to
protect "from arrest the vast majority of seriously ill
people who have a medical need to use marihuana."
MCL 333.26422(b). It was not intended to protect those
individuals who are fraudulently obtaining written cer-
tifications.

VI. THE HISTORY OF THE WRITTEN CERTIFICATION PROCESS

Shortly after the MMMA was passed, advertisements
began appearing in the print media. These notices
advertised that, for a price, one could visit the mari-
juana doctor and get certified for the use of marijuana.
One such ad in the *Petoskey News Review*, June 22,
2010, p A2, reads as follows:

patients' use of marijuana, including determining and prescribing
proper dosages, monitoring side effects, etc.? Does giving the okay for
a marijuana card create an ongoing physician-patient relationship and
obligate the physician to keep abreast of the situation? Under the
MMMA and the current rules, however, doctors are not required to set
boundaries for their patients or to inquire into the effectiveness or
adverse side effects of the marijuana use. In reality, what have
resulted are faux physician-patient relationships.

Soon thereafter, a billboard appeared on I-75 advertising that, with a phone call, one could be certified for the medical use of marijuana in Michigan. Radio spots then began to advertise that the marijuana doctor would be in Saginaw on Monday, in Bay City on Tuesday, and Midland on Wednesday. With a quick visit to the doctor one could become certified to use, grow, and possibly sell marijuana.

In California, where a similar law has been on the books for a few years, these doctors have taken the process one step further. They have actually set up tents on the beaches and posted signs in front of them advertising easy access to medical-marijuana certification:

College students typically patrol in front of the tents and on the beach, encouraging all passersby to enter the tent and get certified for using marijuana. Doctors in California are now advertising that they will refund the certification fee to anyone for whom they cannot find a marijuana-worthy medical ailment.[33]

The Hemp and Cannabis Foundation advertises on its website that the organization has offices in Detroit/Southfield, Grand Rapids, Kalamazoo, Flint, Saginaw, Marquette, Traverse City, and Lansing and lists six doctors, none of whom resides in Michigan and only one of whom, the aforementioned Dr. Eisenbud, is licensed to practice in this state. <http://www.thc-foundation.org/> (accessed September 10, 2010).

The Michigan Medical Marijuana Certification Center advertises electronic filing on its website, providing a form that can be filled out online to start the certification process. <http://www.mmmcc.net/locations/> (accessed September 10, 2010). One can even electronically file one's signature on the form.

According to the DCH, it had issued 27,755 patient registrations as of September 3, 2010, and has been struggling to manage the rate of applications coming in. Michigan Medical Marihuana Program <http://www.michigan.gov/mdch/0,1607,7-132-27417_51869-202669--00.html> (accessed September 10, 2010).

---

[33] The sale of written certifications has become a very profitable industry in California, as I fear it will soon become here in Michigan. See Mortensen, *California and Uncle Sam's tug-of-war over Mary Jane is really harshing the mellow*, 30 J Nat'l Ass'n Admin L Judiciary 126, 151 (2010) (identifying an "enormous administrative and regulatory void" in connection with medical use of marijuana in California, reporting that it is being filled primarily by "free market principles and by the discretion of marijuana-friendly California doctors who have made a healthy profit off of medical 'recommendations,' " and opining that such "void-fillers do not have the health, safety, and welfare of Californians in mind").

Because of the backlog of applications, House Bill 5902, introduced by Representative George Cushingberry and reported out of the House Committee on Appropriations, proposes to privatize the issuance of registry identification cards to the public. That legislation would require the DCH to contract with a third party to take over the issuance of medical-marijuana registry cards. In essence, this bill proposes to turn over regulation to the persons regulated—an arrangement that, under normal circumstances, would be deemed highly suspect.

Even advertisements for new careers are beginning to appear in the newspapers. One such advertisement appeared in the July 19, 2010, *Northern Express Weekly*:

That someone is spending money to run such an ad well proves that confusion runs rampant concerning what is, and is not, subject to prosecution under the MMMA.

Unfortunately, the administrative rules associated with the MMMA do not provide for any checks and balances on the accuracy of the medical certifications signed by these doctors. At 1,000 new registry applicants a week,[34] Michigan will soon have more registered marijuana users than unemployed individuals—an incredible legacy for the Great Lakes State. And soon we will even have graduates from the Medical Marijuana Academy.

What has been lost in the rush to implement the MMMA is a comprehensive set of administrative rules. Under MCL 333.26425(a), the DCH only had 120 days to draft the administrative rules that are currently in effect.[35] As demonstrated by the rules that did come into being, this was a totally unreasonable time limit for such a task.[36]

No system of regulation can succeed without a clear set of rules. Those wishing to use marijuana need to know when, how, and under what conditions they can legally do so. Providers need to know under what conditions they can legally grow, harvest, and distribute their product, and the operators of the new medical-marijuana clinics that appear to be springing up on

---

[34] See Yung, *Even in a poor economy, the pot industry grows*, Detroit Free Press, June 21, 2010, p 4A.

[35] Mich Admin Code, R 333.101 *et seq.*

[36] The current administrative rules include no reporting requirements, no log-keeping requirements, and no directions for school officials or law enforcement officers on how to regulate the new medical-marijuana industry. The DCH should continue the rule-making process, taking pains to hear from all interested parties. At oral argument, the attorneys for both sides expressed their approval of a negotiated rule-making process. The goal would be to set boundaries for all activities and persons associated with the MMMA.

every corner need to know if they are in fact set up to dispense marijuana to the public legally. Until today, the DCH, the Legislature, and the appellate courts have answered very few of these questions. Pressure and confusion results from trying to operate under a system in which no one has stepped forward and stated specifically what actions are legal and what actions are not. It appears that most elected officials, including my colleagues, understand the political nature of this controversy and simply choose to address the MMMA only to the extent that a particular occasion requires. I, on the other hand, right or wrong, prefer giving some notice to those concerned *before* they are deprived of their liberty and property.[37]

What is clear from reading the lower court record in this case is that no one has set out a comprehensive plan to implement the new MMMA. The job of setting public policy should not be handed to the courts as a consequence of the inaction of legislative or administrative officials. Those elected and appointed officials can choose to remain silent and allow the courts to interpret this act piecemeal or on a case-by-case basis. Or the statute can be revised, or the pertinent administrative rules revised, to provide a clear direction to all citizens, including the judges of the courts, who are affected by this act.

### VII. CONCLUSION

To quote from Sir Walter Scott's 1808 poem, *Marmion*, canto 6, stanza 17, "O, what a tangled web we weave, / When first we practise to deceive!" Of central

---

[37] I am reminded of Shakespeare's sentiments, "Yet the first bringer of unwelcome news / Hath but a losing office," (*The Second Part of King Henry the Fourth*, act 1, sc 1), and "Come hither, sir. / Though it be honest, it is never good / To bring bad news," (*Antony and Cleopatra*, act 2, sc 5), and a more modern equivalent: Please don't shoot the messenger.

importance to this appeal is the question, Is the MMMA a subterfuge for legalizing marijuana in this state, or is it a legitimate medical reform intended to help only those individuals who have a terminal illness or a serious or debilitating medical condition?

The answer is simple. For those who instituted the process of placing the proposal on the ballot, the MMMA was both an avenue for allowing society to explore the medical uses of marijuana and a first step in legalizing marijuana in Michigan. For some citizens who voted for the initiative petition out of empathy for the terminally ill or those suffering from debilitating conditions, it was a vote for a medical process that would help those in need. Unfortunately for all concerned with the implementation of the medical mission, including compassionate-care groups, marijuana growers, marijuana users, marijuana dispensers, the police, prosecutors, municipalities, townships, etc., the act has resulted in much confusion. And it has suggested itself to many purely recreational marijuana consumers as a vehicle to aid in their continuing illicit indulgence in that vice.

In any event, the MMMA is currently the law in Michigan. To the extent possible, it must be administered in a manner that protects the rights of all our citizens. When prosecutors and defense attorneys agree that the law is hazy and unclear and poses hazards to all concerned because it does not with sufficient clarity identify what conduct is subject to prosecution, it is time for action from our legislative and executive officials. While the MMMA may be controversial and polarizing, politics should be set aside in the interest of the rule of law in our state.[38]

---

[38] I note that Senators Roger Kahn, Wayne Kuipers, and Gerald Van Woerkom have introduced bills that might resolve some of the issues raised in this opinion. See SB 616, SB 617, and SB 618 of 2009.

With the MMMA, two roads have diverged in the forest:[39] one leads to refining and distilling the administrative rules and other law associated with the act, and the other leads to the regulators and regulated alike being totally confused concerning how to give effect to the act. The former leads to the orderly implementation of the MMMA, while the latter leads to disrespect for the law and possibly contempt for the rule of the law itself.[40] Our legislative and administrative officials must make a choice: they can either clarify the law with legislative refinements and a comprehensive set of administrative rules, or they can do nothing. In this situation, not deciding is, in fact, a decision to do nothing.[41]

---

[39] This line is adapted from the beginning of Robert Frost's poem, *The Road Not Taken* ("Two roads diverged in a yellow wood . . . .").

[40] An example of confusion at best, or disrespect for the law at worst, is that there is a marijuana shop in Lansing that is less than 100 feet from a school. Clearly, this shop is in violation of the federal Safe and Drug-Free Schools and Communities Act, 20 USC 7101 *et seq.*

[41] I recall an old cartoon that depicted a king in his palace, with his subjects outside rioting, pillaging, and otherwise destroying the kingdom. The king asks, "Why are they rioting, I didn't do anything?" His wisest advisor responds, "Maybe that is the problem."